**In re D.H. OVERMYER TELECASTING CO., INC., Debtor,**

**HADAR LEASING INTERNATIONAL CO., INC., et al., Plaintiffs,**

v.

**D.H. OVERMYER TELECASTING CO., INC., et al., Defendants.**

No. C82–3175.

United States District Court, N.D. Ohio, E.D.

July 11, 1984.

James M. Wilsman, Kevin T. Duffy, Parks, Eisele, Bates & Wilsman, Cleveland, Ohio, for debtor.

Susan B. Collins, Kirk C. Loos, Baker & Hostetler, Cleveland, Ohio, John Silas Hopkins, III, William S. Eggeling, Ropes & Gray, Boston, Mass., for First Nat. Bank of Boston.

John J. Hunter, Toledo, Ohio, for plaintiff-appellant Hadar Leasing International Co.

George R. Royer, Toledo, Ohio, for plaintiff-appellant D.H. Overmeyer.

Richard D. Parsons, Patterson, Belknap, Webb & Tyler, New York City, Robert J. Sidman, Vorys, Sater, Seymour and Pease, Columbus, Ohio, for plaintiff-appellant D.H. Overmeyer.

Norman H. Jackman, Comras & Jackman, Boston, Mass., for plaintiff-appellant Wilkinson Storage Corp, et al.

## ORDER

BELL, District Judge.

The above-entitled action is currently before this court on an appeal from the United States Bankruptcy Court for the Northern District of Ohio, pursuant to 28 U.S.C. § 1334. The judgment being appealed was entered by the Honorable John F. Ray on September 24, 1982 in favor of D.H. Overmyer Telecasting Co., Inc. (hereinafter Telecasting), and The First National Bank of Boston (hereinafter F.N.B.B.). After reviewing the record, briefs of counsel and the applicable law, the court hereby enters its findings as follows:

## I PROCEEDINGS IN BANKRUPTCY COURT

Telecasting is an Ohio Corporation which has been duly licensed to operate and manage the U.H.F. television station, WDHO-TV, Channel 24, in Toledo, Ohio. On August 24, 1976, Telecasting filed a voluntary petition for reorganization under Chapter XI of the Bankruptcy Code in the Southern District of New York. That petition was subsequently dismissed in September, 1980 on the grounds that Telecasting was solvent at the time the petition was filed. Thereafter, on February 6, 1981, Telecasting filed a new voluntary petition for reorganization under Chapter XI in the Bankruptcy Court for the Northern District of Ohio. Pursuant to this petition for reorganization, Telecasting has been operating as a debtor-in-possession of the assets of the television station. On March 25, 1981, the bankruptcy court ordered that control of the Telecasting stock would be transferred to F.N.B.B.

On August 25, 1981, Hadar Leasing International Company, Inc. (hereinafter Hadar) filed an adversary proceeding (hereinafter the Hadar Adversary Proceedings) against Telecasting in the Telecasting Chapter XI proceedings. Hadar is an Ohio corporation which operates from a suite of offices at 3 Park Avenue, New York, New York. Hadar was previously known as the D.H. Overmyer Trucking Company. Currently the status of Hadar is also that of a Chapter XI debtor in the United States Bankruptcy Court for the Northern District of Ohio.

Hadar's complaint in the adversary proceeding sought permission from the bankruptcy court to repossess Telecasting's broadcasting equipment, or alternatively, condition future use of this equipment by Telecasting on the making of rental payments to Hadar. Hadar had previously filed in the Telecasting Chapter XI proceedings a proof of claim for $895,481.80 representing alleged delinquent rental payments. In addition, in the Hadar Adversary Proceedings, Hadar was seeking an order directing Telecasting to either assume or reject a series of purported leases for the broadcasting equipment.

In the early stages of the adversary proceedings, on September 22, 1981, the bankruptcy court, after a September 15, 1981 hearing, issued a pre-trial order which established a schedule for discovery. This order set a trial date of November 30, 1981. Thereafter, on November 12, 1981, the bankruptcy court entered a second order

extending discovery until January 15, 1982, and re-setting the trial date for February 22, 1982.

On September 30, 1981, Telecasting filed an answer and twelve counterclaims to the Hadar complaint. Telecasting claimed that it, and not Hadar, owned the leased equipment and property in its possession. In addition, Telecasting sought as damages all of the money which it alleged was wrongfully extracted from it by Hadar as payments under the alleged leases. At this time, Telecasting also added as a party-defendant on seven of its counterclaims Intermodal Systems Leasing, Inc. (hereinafter I.S.L.I.).

I.S.L.I. was a Delaware corporation which had become inoperative under the laws of Delaware on March 1, 1979. Prior to changing its name I.S.L.I. was known as D.H. Overmyer Leasing Co., Inc. I.S.L.I. had originally entered into the leases which are the subject of this adversary proceeding with Telecasting, but had subsequently assigned its interest in the leases to Hadar. In Telecasting's claims against I.S.L.I. it alleged that I.S.L.I. had also participated in a scheme to remove funds wrongfully from Telecasting under the lease agreements.

On September 15, 1981, the F.N.B.B. moved to intervene into the Hadar Adversary Proceedings as a party defendant. F.N.B.B. is a national banking association having its principal place of business in Boston, Massachusetts. The alleged grounds for intervention was that F.N.B.B. was an equity security holder of Telecasting. Thereafter, on September 29, 1981, the bankruptcy court granted F.N.B.B. permission to intervene into this action.

In its answer and counterclaim, F.N.B.B. incorporated by reference the pleadings already filed by Telecasting. In addition, F.N.B.B. filed a counterclaim in which it asserted that the leases between Hadar and Telecasting were part of a conspiracy to defraud F.N.B.B. Further, F.N.B.B. asserted that the lease agreements were in violation of certain loan agreements with the various Overmyer entities.

On November 24, 1981, Hadar filed its reply and a counterclaim to F.N.B.B.'s and Telecasting's counterclaim. A jury demand was included in these pleadings. That same date, motions for leave to intervene into the Hadar Adversary Proceedings were filed by Daniel H. Overmyer, D.H. Overmyer Co., Inc. (Ohio) (hereinafter D.H. O.), and Overmyer Distribution Services, Inc. (hereinafter O.D.S.). After the parties seeking intervention were first advised that the discovery schedule and trial date would not be continued, the motions to intervene were granted by the bankruptcy court on December 24, 1981. The intervening parties then filed pleadings against F.N.B.B. which were titled answers and counterclaims. Jury demands were also included in these pleadings. These pleadings were later stricken by the bankruptcy court because they were deemed to have been improperly filed as answers. Thereafter, on February 11, 1982, D.H.O., O.D.S. and I.S. L.I. filed complaints, while Daniel H. Overmyer filed his complaint seven days later.

D.H.O. is an Ohio corporation, which has been, since November 16, 1973, a debtor-in-possession in a Chapter 11 proceeding in the United States Bankruptcy Court for the Southern District of New York. D.H.O. was formed by Daniel H. Overmyer in 1947 as a sole proprietorship in Toledo, Ohio. This proprietorship was eventually incorporated by Mr. Overmyer in 1949 or 1950. At the present time D.H.O. leases warehouse space in several cities throughout the United States.

O.D.S. was a Delaware Corporation which became inoperative under Delaware law on March 1, 1975. O.D.S. was a marketing company which had subleased space from D.H.O. O.D.S. also operated the various warehouses for the period January 1, 1972 through November, 1973.

On January 15, 1982, Telecasting and F.N.B.B. filed motions to strike the jury demands raised by the various parties in their pleadings. On February 18, 1982, the bankruptcy court entered an order which granted the motions and denied the jury demand.

On February 22, 1982, a seven-week trial to the bankruptcy court was commenced. On March 23, 1982, Judge Ray granted F.N.B.B.'s motion to dismiss, pursuant to Rule 41(b) of the Federal Rules of Civil Procedure, the claims of the plaintiffs, D.H.O., I.S.L.I., O.D.S. and Daniel H. Overmyer.

At the commencement of the trial, counsel for Daniel H. Overmyer advised the bankruptcy court that Mr. Overmyer was ill, and requested a continuance of the trial date. The bankruptcy court then held an evidentiary hearing to determine if Mr. Overmyer's health would prevent him from participating in the trial proceedings. Thereafter, the bankruptcy court found that Mr. Overmyer's health was sufficiently good to enable him to participate in the trial, and the court denied the request for continuance.

On May 24, 1982, the trial proceedings concluded, and the bankruptcy court took the matter under advisement. Four days later, Daniel H. Overmyer filed a personal bankruptcy in the Southern District of New York under Chapter VII of the Bankruptcy Code. Thereafter, on July 22, 1982, Hadar, D.H.O., O.D.S., I.S.L.I. and Daniel H. Overmyer petitioned the United States Court of Appeals for the Sixth Circuit for a writ of mandamus, seeking an order from the appellate court preventing the trial court from rendering a decision. This petition was never granted and the bankruptcy court was permitted to proceed to its findings. *In re Hadar Leasing International Co.*, No. 82–3467 (6th Cir., July 22, 1982).

On September 17, 1982 the bankruptcy court rendered its Findings of Fact and Conclusions of Law. Seven days later the trial court also entered a judgment in favor of Telecasting and F.N.B.B. on their respective counterclaims. Telecasting was awarded a judgment in excess of 3.4 million dollars, and F.N.B.B. was awarded a judgment of over 22.4 million dollars jointly and severally against Hadar, D.H.O., I.S.L.I. and Daniel H. Overmyer. *See In re D.H. Overmyer Telecasting Co., Inc.*, 23 B.R. 823 (Bankr.N.D.Ohio 1982).

Daniel H. Overmyer and D.H.O. filed a notice of appeal to this court on September 30, 1982, and on October 4, 1982, Hadar filed its notice of appeal. I.S.L.I. filed a notice of appeal on October 1, 1982; however, since that time I.S.L.I. has failed to prosecute its appeal in any manner. There has been no designation of issues filed by I.S.L.I. in the bankruptcy court, nor has it filed any briefs in this court to support the appeal.

On October 1, 1982, a petition for a writ of mandamus was filed in the Sixth Circuit by Wilkinson Storage Corporation, Standard Warehouse Co., Inc., Southwest Warehouse Co., Inc., Servicenter, Inc., R–T Realty Corp., Overmyer Canada, Ltd., Overmyer, A.G., A.G.G. Projects, Inc., Overmodal Terminals, Inc., Merchants & Manufacturers Warehouse, Inc., Intermodal Terminals, Inc., Freight Delivery Service, D.H. Overmyer Company (Quebec) Ltd., D.H. Overmyer Company of Canada, Ltd., Deauville Private Rental Homes, Inc., Weathervane Farms, Inc., Expediter Warehouse Co., Omega Executive Services, Inc., Jeebs Distribution Services, Inc., The Overmyer Company, Inc., Barbara Overmyer Strang as Trustee, Howard C. Cook as Trustee of the Testamentary Trust created under the Last Will and Testament of Harrison M. Overmyer, National Distribution Services, Inc., National Distribution Services of California, Inc., Peerless Manufacturing Corporation and Clark Telecasting, Inc. (hereinafter collectively referred to as the Overmyer Intervenors). These parties sought a mandamus order which would set aside the trial court's judgment which related to the transfer to F.N.B.B. of property held by the Overmyer Intervenors. This relief was subsequently denied by the Sixth Circuit. *In re Wilkinson Storage Corporation, et al.*, 776 F.2d 571 (6th Cir.1983). On March 14, 1983, this court granted the Overmyer Intervenors permission to intervene in this appeal as a party-appellant.

## II  FACTS

The trial court has made extensive findings of fact which detail the complex trans-

actions and dealings between the parties. These factual findings have not been disputed by any of the appellants. After reviewing the record, this court determines that ample evidence is contained therein which would support the trial court's findings. Accordingly, this court shall not disturb the findings of fact by the trial court. A summary of the salient facts follows.

A. *Financial Obligations to F.N.B.B.*

The financial obligations of the various Overmyer corporations and entities to the F.N.B.B. which constituted the bankruptcy court's judgment consisted of three main loan obligations and the costs of collection on these loans. The first obligation involved two term loans between D.H.O. and the F.N.B.B. The second obligation was a loan to O.D.S. in which the accounts receivable of various Overmyer companies were assigned as security. The final obligation concerned a substantial overdraft on O.D.S.'s checking account with F.N.B.B.

The term loans were first created in January, 1971, when F.N.B.B. renewed a previous loan of $6,000,000 to D.H.O. This new loan was evidenced by a promissory note with interest on the note being one percent above the prime lending rate charged by F.N.B.B. D.H.O. agreed to repay the loan by making monthly principal payments of $150,000 with the first payment commencing in May, 1971. The balance of the principal was to be payable on December 31, 1971. This loan agreement was subsequently amended by agreement of the parties to have the final principal payment due on December 31, 1972. In the event that any payment on the loan became overdue, the interest rate would then rise to three percent above the prime lending rate on all overdue principal and interest payments. D.H.O. also agreed to pay to F.N.B.B. the cost of collection of this indebtedness in the event of default, including reasonable attorney's fees.

The above term loan to D.H.O. was personally guaranteed by Daniel H. Overmyer at the time of its renewal. In addition, the loan was guaranteed by The Overmyer Company (hereinafter T.O.C.). T.O.C. is a holding company which held at that time the stock of D.H.O., O.D.S. and Telecasting. At this time the stock of Telecasting was pledged to F.N.B.B. to secure the loan.

As part of the loan agreement, D.H.O., T.O.C. and Daniel H. Overmyer warranted to F.N.B.B. that D.H.O. fully owned I.S. L.I., Hadar, D.H. Overmyer Company of Canada, Ltd., D.H. Overmyer Company (Quebec) Ltd., Overmyer Canada, Ltd., Overmyer Terminals, Inc., Standard Warehouse Co., Inc., Servicenter, Inc., Southwest Warehouse Co., Inc., Wilkinson Storage Corporation, Merchants & Manufacturers Warehouse, Inc., R–T Realty Corp., Freight Delivery Service, Inc., and Overmyer A.G. Further, the parties to the loan agreement agreed that neither D.H.O. or any subsidiary corporation owned by D.H.O., T.O.C. or Daniel H. Overmyer would sell, lease or dispose of any of the corporate assets other than in the ordinary course of business. In addition, it was agreed that unless prior approval of F.N.B.B. was given, D.H.O. and/or any subsidiary corporation was prevented from entering into any business transaction with Daniel H. Overmyer, his family or any corporation which Mr. Overmyer is either an officer, director or 5% beneficial owner of the stock therein.

D.H.O., T.O.C. and Daniel H. Overmyer further warranted in the loan agreement that as of the date of loan the only existing indebtedness of Telecasting was accrued wages and payroll taxes, real estate taxes and accrued trade payables. T.O.C. and Mr. Overmyer also agreed that Telecasting would refrain from loaning or advancing funds to D.H.O. in the future without the express permission of F.N.B.B.

F.N.B.B. loaned D.H.O. an additional $500,000 in December of 1971. This loan was evidenced by a promissory note dated December 8, 1971 and due March 8, 1972. T.O.C. and Daniel H. Overmyer also guaranteed payment of this loan. This loan was subsequently renewed by agreement of all the parties thereto until January 2, 1973.

From February, 1971 until February, 1973, D.H.O. made 21 principal payments of $150,000 each to F.N.B.B. All of these payments were applied as provided in the loan agreements to the original six million dollar loan. D.H.O. never made any payments on the separate $500,000 loan. Therefore, in February of 1973, D.H.O. had reduced its balance owed to F.N.B.B. to $2,850,000 on the one promissory note and $500,000 on the second promissory note. On May 8, 1973, O.D.S. executed a guaranty of all obligations of D.H.O. to F.N.B.B. This guaranty was prior to any demand by F.N.B.B. for payment on the two promissory notes.

The second obligation to F.N.B.B. occurred when F.N.B.B. agreed on May 26, 1972 to make a demand loan to O.D.S. of $1,500,000 or an amount equal to 80 percent of O.D.S.'s 60-day accounts receivable, whichever was less. Pursuant to this loan agreement, O.D.S. agreed to assign to F.N.B.B. all of its accounts receivable then in existence or thereafter arising. O.D.S. also agreed to pay the costs of collection which may be incurred by F.N.B.B. to protect or enforce its rights. Expressly included in the loan agreement as a cost of collection were F.N.B.B.'s reasonable attorney's fees.

On the same date, Daniel H. Overmyer and T.O.C. executed a written guaranty to F.N.B.B. of all obligations of O.D.S. Also executed on that date was a pledge to F.N.B.B. of over $927,000 of D.H.O.'s accounts receivable.

The 1.5 million dollars was deposited into O.D.S.'s account with F.N.B.B. Thereafter, F.N.B.B. would collect the accounts receivable of O.D.S. and apply the proceeds towards the loan. Pursuant to the loan agreement, each day F.N.B.B. would automatically advance to O.D.S. the exact amount of the receivables collected that day so that the loan balance always remained $1,500,000. On May 21, 1973, at the request of O.D.S., this assigned accounts receivable loan was increased to $1,650,000.

During November, 1973, F.N.B.B. stopped advancing to O.D.S. the daily collections. At this time, F.N.B.B. applied the proceeds from the collection of O.D.S. and D.H.O. accounts receivables against the balance of the assigned accounts receivable loan. This action resulted in a reduction by January 1, 1974, of the loan balance to $81,777.68 Concurrent with the loan reduction, F.N.B.B. provided O.D.S. with a statement of loan account. This statement reflected the proceed applications by the bank to the O.D.S. loan balance.

The final Overmyer obligation to F.N.B.B. was the overdraft on the O.D.S. bank account. From August, 1972 through August, 1973, O.D.S. consistently overdrew its checking account at F.N.B.B. On August 28, 1973, F.N.B.B. informed the Overmyer organization that thereafter it would charge interest at the prime rate plus one percent on any overdraft in the O.D.S. checking account. By November 30, 1973, the O.D.S. overdraft had risen to $3,981,-345.15.

In October and November, 1973, F.N.B.B. began to dishonor checks that created overdrafts on the Overmyer bank account. After D.H.O. filed on November 16, 1973, a Chapter 11 bankruptcy petition in the Southern District of New York, F.N.B.B. began to apply all of its collections of O.D.S. and D.H.O. accounts receivables to reduce the overdraft on the O.D.S. account.

With the exceptions of the accounts receivables collected by F.N.B.B., O.D.S. has not paid the overdraft on its checking account. This obligation has risen, as a result of the agreed upon interest charges, to be, as of March 31, 1982, $6,230,742.07.

On May 2, 1974, F.N.B.B. made a demand for payment on D.H.O., T.O.C. and Daniel H. Overmyer for the $3,350,000 which was the balance due on the two term loans. A similar demand was made on O.D.S. on November 26, 1975. No payment was forthcoming on the loans. As of March 31, 1982, the amount due on the two loans was $11,723,754.23. This includes $3,350,000 in principal and $8,373,754.53 in outstanding interest from February, 1973.

On November 26, 1975, F.N.B.B. made a demand on T.O.C., O.D.S. and Daniel H. Overmyer for the $81,777.68 principal balance due on the O.D.S. accounts receivable loan. Copies of this demand were sent to D.H.O. As of March 31, 1982, F.N.B.B. has been unable to collect this balance, which has risen to $171,947.76 as a result of interest accrued pursuant to the loan agreement.

The final portion of the bankruptcy court's judgment in favor of F.N.B.B. consisted of the costs incurred by the bank in its attempts to collect the obligations of D.H.O., O.D.S., T.O.C. and Mr. Overmyer. The court found that the efforts of the Overmyer organizations and the Overmyer entities counsel caused the cost of collecting the balance due the bank to be unnecessarily increased. The court found that the reasonable costs of collection were $4,267,-330.91 plus interest.

An example of the efforts taken to frustrate F.N.B.B.'s efforts to collect the Overmyer obligations can be seen by the treatment given the discovery requests in earlier litigation. The records of the various Overmyer organizations were kept in a barn and garage owned by Weathervane Farms, Inc. During the course of discovery, various members of the Overmyer family and/or their counsel would remove or rearrange the documents which F.N.B.B. had selected for discovery. In some instances, the documents were destroyed by some of the Overmyer people in direct violation of an order of the Massachusetts Superior Court.

B. *Asset Transfers*

The bankruptcy court found that Daniel H. Overmyer and the corporations which he controlled devised and implemented a scheme to defraud F.N.B.B. and their other creditors. In furtherance of this scheme to defraud, Daniel H. Overmyer and the entities he controlled have used the protection of the bankruptcy courts to avoid paying their creditors, while moving and concealing their assets by transferring said assets from entity to entity.

The implementation of this scheme to defraud F.N.B.B. and the other creditors commenced when Daniel H. Overmyer and his attorney Edmund Connery transferred I.S.L.I., Hadar, D.H. Overmyer Company of Canada, Limited, D.H. Overmyer Company (Quebec) Ltd., Overmyer Canada, Ltd., Overmodal Terminals, Inc., Standard Warehouse Co., Inc., Servicenter, Inc., Southwest Warehouse Co., Inc., Wilkinson Storage Corporation, Merchants and Manufacturers Warehouse, Inc., R–T Realty Corp., Freight Delivery Service, Inc. and Overmyer A.G. from D.H.O.'s ownership to T.O.C. All of these corporations had been pledged to F.N.B.B. in the term loan agreements with D.H.O. and were guaranteed by Daniel H. Overmyer and T.O.C. Thereafter, the above corporations were then transferred to Daniel H. Overmyer, who proceeded to place them in a trust fund located in Bermuda (hereinafter the Bermuda Trust). After transferring these corporations to the Bermuda Trust, Daniel H. Overmyer had various backdated corporate minutes prepared to document the transfers. These minutes purported to show that the assets transfer had occurred on February 8, 1972, instead of the actual transfer of sometime after August 13, 1973. The backdated minutes are directly contradicted by numerous public records as well as the other records of these companies. Within three months after these corporations were actually transferred out of D.H.O., it filed bankruptcy on November 16, 1973.

At the same time the corporations were transferred out of D.H.O., Daniel H. Overmyer had all of the stock of Intermodal Terminals, Inc. transferred to him from T.O.C. As with the other corporations, the minutes of this transaction were backdated to February 8, 1972. Although consideration was stated in the documentation created for this stock transaction, none was actually paid by Daniel Overmyer. In fact, Intermodal Terminals was to be used as a vehicle to fraudulently transfer the personal residence of Mr. and Mrs. Daniel Over-

myer away from the reach of their creditors, such as F.N.B.B.

This fraudulent conveyance was accomplished by backdating two deeds to February 7, 1972 and then conveying the property to Intermodal Terminals. However, these deeds were actually recorded on August 16, 1973 and September 27, 1973, and stated that the consideration for the transfer was $10.00 each. After transferring the real property to Intermodal Terminals, the stock of the corporation was then transferred to the Bermuda Trust in a backdated transaction at the same time as the other Overmyer corporations. The bankruptcy court found that all of the above transfers to the Bermuda Trust were done by the parties to the transfers with the deliberate and actual intent to hinder, delay and defraud F.N.B.B. in collecting the obligations of T.O.C., D.H.O., O.D.S. and Daniel Overmyer.

The fraudulent transfers of property by Daniel Overmyer was not limited to the transactions involving the Bermuda Trust. In documents backdated to May of 1973, Daniel Overmyer presumably sold to his wife, Shirley, all of the outstanding stock in Formodal, Inc., and Overmyer Europe, Ltd. The bankruptcy court found, however, that the actual transfer had taken place after September 25, 1973. Mrs. Overmyer immediately thereafter, in another backdated transaction, conveyed 80 percent of her interest in these corporations to the Barbara M. Overmyer Trust, and resold the remaining 20 percent to the Harrison M. Overmyer Trust.

After the above transfers were completed, Daniel Overmyer and his attorney Edmund Connery effected a change of name of Overmyer Europe, Ltd. to Deauville Private Rental Homes, Inc., and a change of name of Formodal, Inc., to Weathervane Farms, Inc. The bankruptcy court found that these transfers were also fraudulently made in order to prevent F.N.B.B. from collecting from the various Overmyer entities.

The bankruptcy court also found that Daniel H. Overmyer used the bankruptcy courts to hinder F.N.B.B.'s collection efforts. In December, 1975, F.N.B.B. gave notice pursuant to its loan agreements with D.H.O., T.O.C. and Daniel H. Overmyer of its intention to sell all of the outstanding capital stock of Telecasting at an auction scheduled for December 17, 1975. Prior to the auction, T.O.C., the holding company which owned the stock of Telecasting, filed a Chapter XI arrangement in the Southern District of New York on December 15, 1975. This filing enjoined F.N.B.B. from going forward with the proposed auction.

Having been frustrated by the T.O.C. bankruptcy to sell the stock in Telecasting, F.N.B.B. then sought in the Ohio state courts to have a receiver appointed to take over the assets of Telecasting. After an extensive trial, the Ohio Common Pleas Judge announced he was persuaded that the appointment of a receiver was warranted under Ohio law. However, prior to the actual appointment, Daniel H. Overmyer caused Telecasting to file on August 24, 1976, a petition in the Bankruptcy Court for the Southern District of New York pursuant to Chapter XI. This filing immediately divested the Ohio Common Pleas Court of jurisdiction and terminated the appointment of a receiver over the assets of Telecasting. The sole purpose of the filing of the original Telecasting Chapter XI petition was to frustrate F.N.B.B.'s attempt to preserve the assets of Telecasting.

### C. Telecasting Fraud

At the time of its original filing petition under Chapter XI, Telecasting was a solvent and successful company. Eventually this Chapter XI petition would be dismissed because the New York bankruptcy court would find that Telecasting was solvent at the time of its filing. The bankruptcy court below found that while Telecasting was in its original Chapter XI arrangement, Daniel H. Overmyer and the other Overmyer entities devised a scheme to fraudulently remove assets from this solvent corporation. This was accomplished through the use of various lease agree-

ments between Telecasting and Hadar and I.S.L.I.

In 1966, Telecasting began leasing most of its equipment and the land upon which its transmitter and tower are located from D.H. Overmyer Leasing Co., Inc., which later changed its name to I.S.L.I. Under the terms of these leases, Telecasting was to pay I.S.L.I. $13,534.56 per month for the initial period of the leases. After renewal Telecasting's rental payments would be reduced to less than $2,000 per month for the remainder of the subsequent lease period. Thereafter, Telecasting was to be granted a purchase option of $1.00 to be exercised at the termination of the subsequent lease period.

Sometime after the August 24, 1976 filing of the Telecasting Chapter XI petition in New York, Mr. Overmyer and his agents created an assignment of all of the Telecasting leases with I.S.L.I. to Hadar. This assignment was accomplished by backdating the documents to December 8, 1975, a date before the Telecasting Chapter XI petition. The consideration which was stated in the assignment agreement was $466,000. However, this consideration was found by the bankruptcy court to have never been paid.

The purpose of the assignment was to permit the writing of new leases for the broadcasting equipment. The new leases provided for rental payment to Hadar of $16,790.40 per month for the same equipment that Telecasting would have been leasing from I.S.L.I. for less than $2,000 per month. There were no provisions under the new lease for renewal or for a purchase option at the end of the lease. Under the terms of the new Hadar lease, Telecasting was also responsible for all maintenance, repair, upkeep, insurance and all other burdens for the use of the equipment.

In addition to the lease assigned by I.S.L.I., Hadar entered into various new leases with Telecasting. These leases included leases of useless or nonexistent equipment, leases for equipment that was not yet delivered to Telecasting and even a lease of equipment that Telecasting already owned.

Hadar also leased to Telecasting equipment for which it never paid the supplier. As a result of this failure to pay for the equipment, certain creditors have in the past brought replevin actions to recover the equipment from Telecasting. After one such incident, on June 19, 1979 a settlement was entered into with Hadar, I.S.L.I., Telecasting and the supplier, General Electric. Under the terms of the settlement Telecasting directly paid General Electric for the equipment. However, the actual ownership of the equipment remained with Hadar and I.S.L.I., while Telecasting was required to continue making the monthly lease payments to Hadar.

Since the bankruptcy court determined that the Hadar leases were part of a fraudulent scheme designed through a conspiracy between D.H.O., Hadar, I.S.L.I. and Daniel H. Overmyer, each member of this conspiracy was found to be jointly and severally liable to Telecasting. The amount of their liability was ascertained to be the difference between the payments made by Telecasting to Hadar and various other Overmyer entities, and those payments made by Hadar to or on behalf of Telecasting.

For the period January 1, 1976 through January 31, 1981 the court found that Telecasting made lease payments and other payments on Hadar's behalf which totalled $3,191,909.01. During this same period, the court found that Hadar made payments to or on the behalf of Telecasting which totalled $671,688.99. This resulted in a judgment of $2,520,240.02 in favor of Telecasting.

The remaining portions of the Telecasting judgment consisted of a variety of items. The bankruptcy court found that various Overmyer companies had received funds from Telecasting which resulted in no benefit to Telecasting. These payments included $349,761.41 transferred to T.O.C. in 1981 which was used to make interest payments to F.N.B.B., and also a payment of $37.26 by Telecasting for flowers for Daniel H. Overmyer's wife.

## III ISSUES PRESENTED ON APPEAL

On October 12, 1982, the appellants, Daniel H. Overmyer and D.H.O., filed a statement pursuant to then applicable Rule 806 of the Bankruptcy Rules which designated seven broad issues to be prosecuted in this appeal. The record was also properly designated at that time, and on November 15, 1982 was transmitted to this court. After numerous extensions were permitted by this court a final deadline for the appellants' briefs was set for April 15, 1983. Thereafter, on March 29, 1983, the appellants filed an amended statement of issues which attempted to present thirty-six specific issues on the appeal. Most of these 'new' issues had already been preserved by the original statement, however, this amended statement was filed without the appellants first obtaining leave to amend. Subsequently, this amended statement was stricken by this court for failure to obtain leave to file such a pleading.

After first obtaining permission from the Bankruptcy Court for the Northern District of Ohio and the Bankruptcy Court for Southern District of New York, D.H.O. dismissed its appeal pursuant to Bankr.R. 8001(c)(2). Accordingly, the court shall consider only the issues originally presented by Daniel H. Overmyer in this appeal. The court shall also consider the issues properly presented by Hadar and by the Overmyer Intervenors.

## IV JURISDICTIONAL ISSUES

### A. Bankruptcy Court's Subject Matter Jurisdiction

■ The first issue which must be addressed is whether the bankruptcy court had the requisite subject matter jurisdiction to make the extensive findings which were entered. It is undisputed that the Supreme Court has found that the vesting of jurisdiction in a bankruptcy court by 28 U.S.C. § 1471(c) is unconstitutional because the bankruptcy courts were not created under Art. III of the Constitution. Northern Pipeline Construction Co. v. Marathon Pipe Line Co., 458 U.S. 50, 102 S.Ct. 2858, 73 L.Ed.2d 598 (1982). However, the Supreme Court ruled that the effective date of Northern Pipeline would be stayed until October 4, 1982. Subsequently, this stay was extended until December 24, 1982. Northern Pipeline Construction Co. v. Marathon Pipe Line Co., 459 U.S. 813, 103 S.Ct. 199, 200, 74 L.Ed.2d 160 (1982).

The Sixth Circuit has also had the opportunity to interpret the holding of Northern Pipeline. In White Motor Corporation v. Citibank, N.A., 704 F.2d 254 (6th Cir.1983), the court had to determine the extent of the bankruptcy court's jurisdiction to hear cases after December 24, 1982. The court found that the prospective-only provision in Northern Pipeline provides the bankruptcy court with the requisite jurisdiction to hear cases which became final in the bankruptcy court on or before December 24, 1982. White Motors Corporation v. Citibank, N.A., supra at 257–58.

Each of the appellants have argued that the bankruptcy court lacked subject matter jurisdiction because the judgment was not final as required by White Motors Corporation v. Citibank, N.A., supra. This contention is not supported by the record and must be dismissed. In this action the judgment from which this appeal is taken was entered by the bankruptcy court on September 24, 1982. This judgment became final as provided for under the bankruptcy rules ten days later. Therefore, the bankruptcy court's order was a final order prior to the December 24, 1982 date set by Northern Pipeline. Hence, the bankruptcy court had subject matter jurisdiction to decide this case.

The appellees contend that each of the appellants have waived the jurisdiction issue by failing to assert Northern Pipeline in the trial court. However, having first determined that the bankruptcy court's jurisdiction was proper under the analysis of White Motor Corporation v. Citibank, N.A., supra, the court finds that it is not necessary at this time to resolve the constitutional question of whether the appellants can waive the Northern Pipeline jurisdictional issue.

## B. *F.N.B.B.'s Intervention*

The original adversary proceedings were brought by Hadar to collect on the alleged leases from Telecasting. At that point in the adversary proceedings, F.N.B.B. sought and obtained leave from the bankruptcy court to intervene as a party co-defendant. Thereafter, F.N.B.B. asserted the counterclaims against Hadar which ultimately resulted in the judgment presently under appeal. Subsequently, F.N.B.B. also asserted similar counterclaims against I.S.L.I., D.H.O. and Daniel H. Overmyer after the bankruptcy court permitted their intervention into the adversary proceedings.

The appellants have challenged the bankruptcy court's order which permitted F.N.B.B. to intervene into the adversary proceedings. In addition, the appellants have argued that once the court permitted F.N.B.B.'s intervention, the court erred by not limiting F.N.B.B.'s intervention and permitting the bank to assert the counterclaims.

The authority stated by the bankruptcy court in allowing the intervention of F.N.B.B. was 11 U.S.C. § 1109(b), which follows.

(b) A party in interest, including the debtor, the trustee, a creditor's committee, an equity security holders' committee, a creditor, *an equity security holder*, or any indenture trustee, *may raise and may appear and be heard on any issue* in a case under this chapter. (Emphasis added.)

11 U.S.C. § 1109(b). At the time of the intervention it is undisputed that F.N.B.B. was the owner of all of the equity securities issued by Telecasting and was also a creditor of Telecasting. The bankruptcy court found that as an equity security holder as defined under § 1109(b), F.N.B.B. had the right to participate fully in the adversary proceedings.

The appellants contend that § 1109(b) does not provide an equity security holder with an absolute right to intervene into an adversary proceeding. The appellants assert that the proper criteria for intervention into an adversary proceeding is found in Rule 24(a)(2) of the Federal Rules of Civil Procedure. Intervention by a party is permitted as a matter of right under Rule 24(a)(2) which states as follows:

(2) When the applicant claims an interest relating to the property or transaction which is the subject of the action and he is so situated that the disposition of the action may as a practical matter impair or impede his ability to protect that interest, unless the applicant's interest is adequately represented by existing parties.

Rule 24(a)(2) of the Federal Rules of Civil Procedure. The appellants contend that Telecasting was in the position to adequately represent the interest of F.N.B.B. in the adversary proceedings, thereby permitting F.N.B.B. intervention was error by the bankruptcy court.

The finding by the bankruptcy court that F.N.B.B. was permitted to intervene as a matter of right cannot be considered error. The language of § 1109(b) clearly provides an equity security holder with the right to be heard in an adversary proceedings. *Matter of Marin Motor Oil, Inc.,* 689 F.2d 445 (3d Cir.1982). Any other construction given to the statute would be contrary to the accepted principles of statutory interpretation. Therefore, having found that F.N.B.B. was an equity security holder of the debtor in the adversary proceedings, the bankruptcy court properly permitted F.N.B.B. intervention pursuant to § 1109(b) into the Hadar adversary proceedings.

The appellant's contention that F.N.B.B.'s intervention did not meet the standard for intervention found in Rule 24(a)(2) is also without merit. The bankruptcy court found that Telecasting could not adequately represent the interests of F.N.B.B. in the adversary proceedings. It is undisputed that prior to its intervention F.N.B.B. as the owner of the debtor had a financial interest in the outcome of the Hadar adversary proceedings. However, the bankruptcy court found that Telecasting might not have standing to raise certain claims and defenses against Hadar which would be available to F.N.B.B.

The record clearly demonstrates that Telecasting was the victim of massive fraud to drain away its assets under the protection of the bankruptcy courts. Because of the participation of the parties who were in control of Telecasting at the time of the fraud, Telecasting could not raise all of the claims and defenses against Hadar that F.N.B.B. could raise. Therefore, the intervention by F.N.B.B. was also proper under Rule 24(a)(2) of the Federal Rules of Civil Procedure.

C. *The Counterclaims of F.N.B.B. and Telecasting.*

■ The appellants contend that if F.N.B.B.'s intervention was proper, then its participation in the adversary proceedings should have been limited to defending against Hadar's original claims. The appellants first assert that F.N.B.B. as an intervenor is restricted to the issues already before the trial court. However, the statute which provides for intervention, 11 U.S.C. § 1109(b), does not restrict the participation of the intervenor in the action.

Congress has expressly provided that an equity security holder such as F.N.B.B. *"may raise* and may appear and be heard on *any issue in a case."* (Emphasis added.) 11 U.S.C. § 1109(b). This language clearly shows that Congress intended the participation by an equity security holder in an action not to be limited only to issues already present in the proceedings as the appellants contend. Instead, the statute provides that an equity security holder may raise new issues. *Matter of Marin Motor Oil, Inc., supra,* at 454. Hence, Section 1109(b) does not prevent F.N.B.B. from raising its counterclaims in the adversary proceedings.

■ Hadar also contends that the filing of counterclaims by F.N.B.B. and Telecasting should have been prohibited by the bankruptcy court pursuant to the automatic stay provisions of 11 U.S.C. § 362(e). In support of this position, Hadar has cited numerous cases which have found that counterclaims cannot be asserted in automatic stay litigation brought under 11 U.S.C. § 362(e). *See: Matter of Roloff,* 598 F.2d 783 (3d Cir.1979); *In re Simmons,* 13 B.R. 429 (D.Minn.1981); *In re Born,* 10 B.R. 43 (S.D.Tex.1981). In each of these cases, the courts correctly prevented a party from asserting counterclaims against a creditor seeking relief under § 362 from the automatic stay.

Hadar contends that the above cases are applicable to the instant action, thereby mandating reversal of the bankruptcy court. In response, the appellees assert that the above case law is not applicable because the Hadar adversary proceedings were not solely brought pursuant to § 362. The appellees also contend that Hadar has waived this argument by failing to object in the bankruptcy court to the filing of the counterclaims.

In order to determine whether F.N.B.B. and Telecasting should have been permitted to bring their counterclaims, it is necessary to ascertain if Hadar's claim was solely for relief from the automatic stay. In Hadar's original pleadings in the adversary proceeding, it did seek relief from the automatic stay. In addition, however, Hadar also sought adequate protection pursuant to 11 U.S.C. § 363(e); repossession of Telecasting's equipment pursuant to 11 U.S.C. § 542; reclamation pursuant to 11 U.S.C. § 546(c)(2); an order directing Telecasting to assume or reject the leases pursuant to 11 U.S.C. § 365; and money damages.

Although the bankruptcy code prohibits a party from asserting a counterclaim in an adversary proceeding when the original pleading seeks relief from the automatic stay, the code does not prevent the filing of counterclaims when the complaint seeks other remedies such as repossession, reclamation and assumption or rejection of leases. In addition, counterclaims which relate directly to the amount of Hadar's claim and which allege fraud with respect to the underlying claim must be permitted. *In re Lockwood,* 14 B.R. 374 (Bankr.E.D.N.Y. 1981); *United Companies Financial Corp. v. Brantley,* 6 B.R. 178 (Bankr.N.D. Fla.1980). Therefore, the court concludes that the filing of counterclaims by F.N.B.B.

and Telecasting was proper. Having determined that the counterclaims were proper, the court need not determine whether the appellants waived this issue by failing to object to the counterclaims in the bankruptcy court.

## V PRETRIAL ISSUES.

### A. *Control of Discovery by the Bankruptcy Court.*

Hadar has asserted that the manner in which the bankruptcy court controlled discovery prevented adequate preparation for trial. Hadar contends that it had only four months from the time F.N.B.B.'s counterclaims were filed until the trial date to prepare its case. This period for discovery, Hadar asserts, was totally inadequate because of the complexity of the litigation and constituted an abuse of discretion by the trial judge.

The bankruptcy court originally set a discovery cut-off date of November 30, 1981, which was two months after the filing of the Telecasting and F.N.B.B. counterclaims. Subsequently, the court ordered that the cut-off date be extended to January 15, 1982. This extension was not requested by Hadar, nor does the record demonstrate that Hadar ever requested any extension of a discovery cut-off date.

A trial court's order setting a discovery cut-off date is within the sound discretion of the court and shall not be overturned unless an abuse of discretion is clearly shown in the record. *Admiral Theater Corp. v. Douglas Theater Co.,* 585 F.2d 877, 898 (8th Cir.1978); *Perel v. Vanderford,* 547 F.2d 278, 280 (5th Cir.1977); *Barnard v. Wabash R.R.,* 208 F.2d 489, 498 (8th Cir.1953). No such showing of an abuse of discretion can be ascertained from the record in this action. Instead the record reveals that Hadar's trial counsel stated at the opening of the trial proceedings that they were able to adequately prepare for trial. (1 Tr. 24).

Hadar was given adequate time to prepare for the trial and the record does demonstrate that Hadar undertook considera-

ble discovery. Even if the time allocated by the trial court was insufficient, the record clearly shows that Hadar failed to object to the discovery cut-off dates or request additional time for further discovery. Hence, the court can find no merit to this argument.

### B. *Denial of Various Hadar Discovery Request.*

The trial court also made several rulings which prevented Hadar from obtaining various documents through discovery, and prevented it from deposing certain senior officials of F.N.B.B. These documents involved the financial dealings between F.N.B.B., Telecasting and Daniel H. Overmyer. Hadar has asserted that the denial of this material through discovery was prejudicial and would be grounds for a new trial.

The trial court found that Hadar's discovery requests were merely duplication of the requests made by the same parties in litigation before the Massachusetts Superior Court in and for the County of Suffolk entitled *The First National Bank of Boston v. Daniel H. Overmyer,* Civil Action No. 13892. In the Massachusetts litigation, discovery surrounding the financial dealings between the F.N.B.B. and Daniel H. Overmyer were fully exchanged and disclosed under the supervision of the state court. All of the discovery generated in the Massachusetts litigation as well as the discovery in numerous other litigation between F.N.B.B. and the various Overmyer entities had been stipulated by the parties for use in the instant action.

Since Hadar already had access to the material being requested, the bankruptcy court found that Hadar would have to demonstrate some "extraordinary circumstances" which would show the unavailability or need for the material requested. Absent such a showing by Hadar, the trial court found that the discovery requests would be a duplication of the parties' earlier efforts in other litigation which could only delay and increase the expense of the proceedings. After this ruling, Hadar made no attempt to demonstrate the "extraordinary

circumstances," nor did it attempt to obtain the material.

■ The standard for reviewing the trial court's denial of discovery requests is whether the court abused its discretion. This abuse of discretion is demonstrated when there is a showing that Hadar's rights were substantially prejudiced. *Admiral Theater Corp. v. Douglas Theater Co., supra.; Aviation Specialties, Inc. v. United Technologies Corp.*, 568 F.2d 1186 (5th Cir.1978); *Apel v. Murphy*, 70 F.R.D. 651, 654 (D.R.I.1976). However, no such showing has been made in this action.

Hadar argues that a showing of substantial prejudice is present because the material sought was relevant and necessary for trial preparation. Although this court agrees that some of the material involving the financial dealings between F.N.B.B. and Daniel H. Overmyer would indeed be relevant to a resolution of this conflict, the trial courts ruling was proper. Since Hadar had already obtained or had access to the information requested, the issue is not one of relevancy, but solely whether there was any prejudice as a result of the trial court's ruling. Clearly the record shows that no such prejudice existed.

C. *Dismissal of Hadar's Claim of Fraud.*

■ On December 21, 1981, Hadar filed an amended complaint which asserted a claim of a conspiracy between Telecasting and F.N.B.B. to fraudulently damage Hadar's business. The damages sought in this claim was five million dollars against both of the appellants. Thereafter, on December 23, 1982, Hadar was ordered to respond by December 30, 1982, to various discovery requests filed by the appellants which involved the alleged conspiracy and fraud between Telecasting and F.N.B.B. Hadar complied with the court's order.

On January 19, 1982, Telecasting filed a motion to dismiss this claim on the grounds that the responses to the discovery were totally deficient and failed to disclose the basis for the claim. This motion was subsequently joined by F.N.B.B. on January 22, 1982. However, the record reveals that Hadar did not file any response in opposition to this motion, and the bankruptcy court dismissed the claim on February 11, 1982.

In this appeal Hadar has asserted that the bankruptcy court abused its discretion by dismissing the claims for inadequate discovery responses pursuant to Fed. Rule Civ.Proc. 37. In order to determine if any abuse of discretion occurred, it is necessary to review the facts before the trial court. The question is not whether this court would have dismissed the action, but whether the trial court abused its discretion in so doing. *National Hockey League v. Met. Hockey Club*, 427 U.S. 639, 642, 96 S.Ct. 2778, 2780, 49 L.Ed.2d 747 (1976). The bankruptcy court, in its memorandum opinion directing that the claim be dismissed found the facts of the discovery proceedings as follows:

Hadar's pleading asserted that the claim was being added promptly upon learning of facts and circumstances underlying the claim.

Telecasting served a set of interrogatories addressed to ascertaining the recently discovered "facts and circumstances" alleged by Hadar, together with a request for production of documents.

Hadar's responses to the interrogatories were evasive, and a restatement of the allegations contained in count two of the amended complaint.

Telecasting took the deposition of Edmund Connery, one of the witnesses, and his answers, appended to Telecasting's motion to dismiss, clearly show that he knew nothing which could support the filing of Hadar's count two.

Hadar failed to produce a single document in response to Telecasting's second request for production of documents. Hadar's response to Telecasting's second request for production of documents was evasive and inadequate, and not responsive to the request.

Under the circumstances in this case, the trial court did not abuse its discretion. The court specifically found that the answers to

the discovery requests were "evasive and inadequate." Specifically the finding that a witness, who was given by Hadar as being its representative knowledgeable on the claim, and who thereafter admitted to being totally unaware of any facts to support the claim, demonstrates that the trial court acted within its discretion. Coupled with the specific findings by the trial court, is the undisputed fact that Hadar failed to even respond to the motion to dismiss. Hence this issue being first raised on appeal is totally without merit.

## VI  RIGHT TO A JURY TRIAL

█ The appellants have asserted that the proceedings in the bankruptcy court were invalid because they were entitled to a jury trial as a matter of right. This right, it is asserted, was denied to the appellant when the trial court granted motions filed by the appellees to strike the jury demands in the appellant's pleadings.

The appellants contend that the proceedings below involved both legal and equitable elements, therefore the right to a jury trial on the legal issue would automatically be present. The right to a trial by jury in a legal proceeding has been defined by the Supreme Court as follows:

> where both legal and equitable issues are presented in a single case, "only under the most imperative circumstances which in view of the flexible procedures of the Federal Rules we cannot now anticipate, can the right to a jury trial of legal issues be lost through prior determination of equitable claims." That holding, of course, applies whether the trial judge chooses to characterize the legal issues presented as "incidental" to equitable issues or not. (Footnotes omitted.)

*Dairy Queen v. Wood,* 369 U.S. 469, 472–73, 82 S.Ct. 894, 897, 8 L.Ed.2d 44 (1962), *citing Beacon Theatres, Inc. v. Westover,* 359 U.S. 500, 510–11, 79 S.Ct. 948, 956–57, 3 L.Ed.2d 988 (1959). However, the courts have uniformly held that there is no constitutional right to a jury trial in a bankruptcy court because such proceedings are equitable in nature. *Katchen v. Landy,* 382 U.S. 323, 336–38, 86 S.Ct. 467, 477, 15 L.Ed.2d 391 (1966); *Whitlock v. Hause,* 694 F.2d 861, 863 (1st Cir.1982); *Matter of Berry,* 680 F.2d 705, 710 (10th Cir.1982); *In re Merrill,* 594 F.2d 1064, 1067 (5th Cir.1979).

The Supreme Court has found that the voluntary submission of a party to the jurisdiction does not deny a party to a right to a jury trial as set forth in *Dairy Queen v. Wood, supra.* The Court found:

> [A]lthough petitioner might be entitled to a jury trial on the issue of preference if he presented *no claim in the bankruptcy proceedings* and awaited a federal plenary action by the trustee, *Schoenthal v. Irving Trust Co.,* 287 U.S. 92 [53 S.Ct. 50, 77 L.Ed. 185], when the same issue arises *as part of the process of allowance and disallowance of claims,* it is triable in equity.... As bankruptcy courts have summary jurisdiction to adjudicate controversies relating to property over which they have actual or constructive possession, *Thompson v. Magnolia Petroleum Co.,* 309 U.S. 478, 481 [60 S.Ct. 628, 629, 84 L.Ed. 876]; *Cline v. Kaplan,* 323 U.S. 97, 98–99 [65 S.Ct. 155, 156, 89 L.Ed. 97]; *May v. Henderson,* 268 U.S. 111, 115–16 [45 S.Ct. 456, 458–59, 69 L.Ed. 870], and as the proceedings in equity, *Local Loan Co. v. Hunt,* 292 U.S. 234, 240 [54 S.Ct. 695, 697, 78 L.Ed. 1230]; *Pepper v. Litton,* 308 U.S. 295, 304 [60 S.Ct. 238, 244, 84 L.Ed. 281], there is no Seventh Amendment right to a jury trial for determination of objections to claims. (Emphasis added.)

*Katchen v. Landy, supra,* 382 U.S. at 336–337, 86 S.Ct. at 477. Therefore, any rights to a jury trial in the bankruptcy court are not constitutional in origin but must be created by statute.

The limitations on the statutory right to a trial by jury in the bankruptcy court are delineated in 28 U.S.C. § 1480, which states:

> (a) Except as provided in subsection (b) of this section, this chapter and title 11 do not affect any right to trial by jury in a case under title 11 or in a proceeding arising under title 11 or arising in or

related to a case under title 11, that is provided by any statute in effect on September 30, 1979.

(b) The bankruptcy court may order the issues arising under section 303 of title 11 to be tried without a jury.

Hence, when deciding in these proceedings whether a party had a right to a jury trial under the Bankruptcy Code, the court must determine whether the issues presented in the pleadings would have been triable by a jury under the former Bankruptcy Act.

Under the previous Bankruptcy Act, the bankruptcy court was granted summary jurisdiction over the issues concerning the debtor's property which was in the actual or constructive possession of the bankruptcy court. In such summary proceedings, the debtor's right to a jury trial was limited to issues involving involuntary bankruptcy petitions brought by the creditors. 11 U.S.C. § 778(a)(2) (1976); *Matter of Berry, supra,* at 710–711. In this action, the issues do not involve the filing of an involuntary bankruptcy petition. Instead the issues presented in the original pleadings by Hadar and the counterclaims filed by F.N.B.B. and Telecasting concerned the ownership of property in possession of the debtor, and the validity of various leases between Hadar and Telecasting. Therefore, the right to a trial by jury would not have been present under the previous Bankruptcy Act. Hence, no right to a jury trial would be found under the present statute, 28 U.S.C. § 1480.

■ The record further demonstrates that the parties to this appeal had no right to a jury trial because they voluntarily submitted to the summary jurisdiction of the bankruptcy court. Hadar originally filed a proof of claim in the Telecasting bankruptcy proceedings. This proof of claim dealt with the same subject matter as the instant adversary proceedings. The law is settled that such a filing by a creditor of the debtor in bankruptcy is sufficient to consent to the equitable jurisdiction of a bankruptcy court and a waiver of any right to a trial by jury. *Katchen v. Landy, supra. Also see: In re Axton,* 641 F.2d

1262 (9th Cir.1981); *Peters v. Lines,* 275 F.2d 919 (9th Cir.1960); *In re Warren,* 387 F.Supp. 1395 (S.D. Ohio 1975). Hence, Hadar voluntarily submitted to the summary jurisdiction of the trial court when it filed both its proof of claim and the adversary proceedings.

When F.N.B.B., D.H.O., O.D.S. and Daniel H. Overmyer respectively voluntarily intervened into the Hadar Adversary Proceedings, each of these parties also consented to the bankruptcy court's summary jurisdiction. If any right to a jury trial existed, the parties by their own actions have as a matter of law consented to the equity jurisdiction of the bankruptcy court.

## VII   TRIAL PROCEEDINGS

### A.   *Sufficiency of the Evidence.*

■ None of the facts found by the trial court have been disputed by any of the appellants. Accordingly, the trial court's factual findings should not be set aside unless the record demonstrated that they are clearly erroneous. Fed. Rule Civil Proc. 52(a). The Supreme Court has found:

In applying the clearly erroneous standard to the findings of a district court sitting without a jury, appellate courts must constantly have in mind that their function is not to decide factual issues de novo. The authority of an appellate court, when reviewing the findings of a judge as well as those of a jury, is circumscribed by the deference it must give to decisions of the trier of the fact, who is usually in a superior position to appraise and weigh the evidence. The question for the appellate court under Rule 52(a) is not whether it would have made the findings the trial court did, but whether "on the entire evidence [it] is left with the definite and firm conviction that a mistake has been committed." *United States Gypsum Co.,* 333 U.S. 364, 395 [68 S.Ct. 525, 542, 92 L.Ed. 746] (1948). See also *United States v. National Assn. of Real Estate Boards,* 339 U.S. 485, 495–96 [70 S.Ct. 711, 717–18, 94 L.Ed. 1007] (1950); *Commissioner v.*

*Duberstein,* 363 U.S. 278, 289–91 [80 S.Ct. 1190, 1198–1200, 4 L.Ed.2d 1218] (1960).

*Zenith Corp. v. Hazeltine,* 395 U.S. 100, 123, 89 S.Ct. 1562, 1576, 23 L.Ed.2d 129 (1969). In this action the record reveals that the findings of fact are not clearly erroneous and must therefore be taken as established.

Hadar contends that the bankruptcy courts findings of fact are not sufficient to support the legal conclusion that Hadar was part of a scheme to defraud Telecasting and F.N.B.B. The record, however, reveals that such an argument is without merit. Relying upon Section 7 of the Uniform Fraudulent Conveyance Act, the trial court found in essence that two elements must be present to support a finding that a fraudulent conveyance has occurred. The elements are: (1) an actual intent to defraud must be shown and (2) the action taken must result in actual injury to a creditor.

In this action, the record abounds with events that demonstrate that Hadar had the requisite actual intent to defraud and injure Telecasting and its creditors. This intent can be seen from the very beginning of Hadar's involvement with Telecasting when Hadar *backdated* the written assignments of the various Telecasting leases with I.S.L.I. to a date *prior to Telecasting's original filing of bankruptcy.* Hadar received the assignment of those leases, without paying any consideration to anyone, with the sole purpose of obtaining funds from Telecasting and to circumvent the bankruptcy court's protections. Absent the backdating of the assignment transaction, Hadar would have needed the permission of the bankruptcy court to negotiate new leases with Telecasting. The equipment leased to Telecasting included items never received by Telecasting or equipment which had already been paid for by Telecasting. All of the leases included payments which were far in excess of the prevailing market rates for such items.

The second element of an actual injury to a creditor is also easily ascertained from the record. Telecasting paid over two and one-half million dollars to Hadar or on its behalf for which it received absolutely no tangible benefit. These payments effectively drained the assets from Telecasting and have required it to seek the protection from the bankruptcy court. Under such circumstances the requisite harm to creditors has been amply proven.

■ Since the evidence in the record is sufficient to establish that Hadar participated in the conspiracy to defraud the appellees, the judgment for the total injuries caused by the fraud is proper against Hadar. The law is settled that "[c]onspirators are jointly and severally liable and all may be joined or an action may be brought against only one." *Non-Ferrous Metals, Inc. v. Saramar Aluminum Co.,* 25 F.R.D. 102, 104 (N.D. Ohio, 1960). Therefore, it was proper for the trial court to conclude that Hadar, as a co-conspirator in the massive fraud, should be held liable for the total injury suffered by F.N.B.B. and Telecasting.

## B. *Inadmissibility of Hadar's Expert Testimony*

■ Hadar contends that the trial court's ruling preventing it from placing the testimony of an expert concerning the present market value of a television tower into the record was error. Hadar had offered this evidence to determine whether Hadar's interest in the television tower was adequately protected.

This evidence would only be relevant if Hadar had some interest in the tower which was to be protected. However, this is not the case. The trial court specifically found as a fact, which Hadar does not dispute, that I.S.L.I. never assigned the lease in the tower to Hadar. *In re D.H. Overmyer Telecasting Co., Inc., supra* at 852 (Finding 16.3). Thereafter, the court properly concluded that Hadar had no interest in the tower. *Id.* at 930. Thus, any evidence involving the value of the tower was totally irrelevant, and the ruling by the trial court was proper.

## VIII VALIDITY OF THE JUDGMENT

### A. *Effect of Daniel H. Overmyer's Automatic Stay*

■ Daniel H. Overmyer has challenged the validity of the judgment on the grounds that an automatic stay upon the filing of his personal chapter 7 bankruptcy petition in the Bankruptcy Court for the Southern District of New York pursuant to 11 U.S.C. § 362 prohibited the trial court from entering a judgment against him. Mr. Overmyer filed his chapter 7 petition on May 28, 1982 which was four days after the trial proceedings had concluded but prior to the court entering its findings. It is asserted that the trial court should have been stayed from entering the findings and judgment until relief from the stay was achieved in accordance with 11 U.S.C. § 362.

When a bankruptcy petition is filed, Section 362(a) automatically stays all proceedings against the debtor. This stay is applied to any judicial proceedings including the continuation of a trial or the prosecution of an appeal where the debtor is a party. *Cathey v. Johns-Manville Sales Corp.*, 711 F.2d 60, 61 (6th Cir.1983). However, relief from the automatic stay may be achieved by petitioning the bankruptcy court which has jurisdiction over the debtor-party. *Cathey v. Johns-Manville Sales Corp.*, supra, at 62–63; *Association of St. Croix Condominium Owners v. St. Croix Hotel*, 682 F.2d 446, 449 (3d Cir.1982). Once relief from the automatic stay is obtained the court can proceed consistent with the statutory framework of the bankruptcy law.

In this action, F.N.B.B. and Telecasting filed a petition in the Bankruptcy Court for the Southern District of New York for relief from the automatic stay as it would apply to the judgment in the Hadar Adversary Proceedings and any pending appeal. Thereafter, this motion was granted on October 25, 1983 wherein the New York court · ordered that the automatic stay of Mr. Overmyer filing of bankruptcy was terminated *nunc pro tunc*. This order effectively lifted the automatic stay to the date of the filing of the chapter 7 petition by Mr. Overmyer and has rendered moot any alleged violation of the stay.

The judgment entered by the trial court was not stayed by the filing of Mr. Overmyer's petition in the New York bankruptcy court. The entry of the *nunc pro tunc* order removed the automatic stay as of the date of the original filing of the petition and could not interfere with the trial court's ultimate resolution of this matter. *Ass'n of St. Croix Condo v. St. Croix Hotel*, 690 F.2d 367, 368 (3d Cir.1982).

### B. *Effect on Overmyer Intervenors*

■ The Overmyer Intervenors do not dispute the numerous factual findings by the trial court which detail the extent of control exerted by Daniel H. Overmyer over them and how they were used as instruments to perpetrate and conceal the fraud upon the appellees. Instead, it is argued that the judgment cannot be enforced against them because they were non-parties to the adversary proceedings during the trial.

The federal courts have consistently found that a non-party may be bound by a judgment if a party to the suit interests are so closely aligned to the non-party's interests as to be its representative. *See Chicago, R.I. & P. Ry. Co. v. Schendel*, 270 U.S. 611, 46 S.Ct. 420, 70 L.Ed. 757 (1926); *Heckman v. United States*, 224 U.S. 413, 445–46 [32 S.Ct. 424, 434–35, 56 L.Ed. 8] (1912); *Mothers Restaurant, Inc. v. Mama's Pizza, Inc.*, 723 F.2d 1566, 1572 (Fed.Cir.1983); *Aerojet-General Corporation v. Askew*, 511 F.2d 710, 719 (5th Cir. 1975), *cert. denied*, 423 U.S. 908, 96 S.Ct. 210, 46 L.Ed.2d 137 (1975), *reh'g. denied*, 423 U.S. 1026, 96 S.Ct. 470, 46 L.Ed.2d 400 (1975); *Southwest Airlines Co. v. Texas Intern Airlines*, 546 F.2d 84, 94–95 (5th Cir.1977), *cert. denied*, 434 U.S. 832, 98 S.Ct. 117, 54 L.Ed.2d 93 (1977); *Kreager v. General Electric Company*, 497 F.2d 468, 472 (2d Cir.1974), *cert. denied*, 419 U.S. 861, 95 S.Ct. 111, 42 L.Ed.2d 95 (1974), *reh'g. denied*, 419 U.S. 1041, 95 S.Ct. 530,

42 L.Ed.2d 319 (1974); *Pan American Match, Inc. v. Sears Roebuck and Co.*, 454 F.2d 871, 874 (1st Cir.1972), *cert. denied,* 409 U.S. 892, 93 S.Ct. 113, 34 L.Ed.2d 149 (1972). The binding of such a non-party has been defined as occurring when an entity which "controls or substantially participates in the control of the presentation on behalf of a party is bound by the determination of issues decided as though he were a party." Restatement (Second) of Judgments § 39 (1980).

Recently the Supreme Court found that control over litigation by a non-party was sufficient to bind that party to a judgment. The Court found that the interests of the non-party were adequately protected by the representation of a party in the action whose interest are identical to the non-party. The court stated:

These interests are similarly implicated when nonparties assume control over litigation in which they have a direct financial or proprietary interest and then seek to redetermine issues previously resolved. As this Court observed in *Souffront v. Compagnie des Sucreries*, 217 U.S. 475, 486–87 [30 S.Ct. 608, 612–13, 54 L.Ed. 846] (1910), the persons for whose benefit and at whose direction a cause of action is litigated cannot be said to be "strangers to the cause.... [O]ne who prosecutes or defends a suit in the name of another to establish and protect his own right, or who assists in the prosecution or defense of an action in aid of some interest of his own ... is as much bound ... as he would be if he had been a party to the record." See *Schnell v. Peter Eckrich & Sons, Inc.*, 365 U.S. 260, 262 n. 4 [81 S.Ct. 557, 559 n. 4, 5 L.Ed.2d 546] (1961); cf. *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100, 111 [89 S.Ct. 1562, 1570, 23 L.Ed.2d 129] (1969).

*Montana v. United States*, 440 U.S. 147, 154, 99 S.Ct. 970, 974, 59 L.Ed.2d 210 (1979).

The bankruptcy court found, and the record demonstrates, that the Overmyer Intervenors were controlled by Daniel H. Overmyer throughout these proceedings and used to frustrate the efforts of F.N.B.B. to locate the assets pledged to the bank under the loan agreements first created in January, 1971. Within three months of the D.H.O. filing of bankruptcy, Daniel H. Overmyer caused the transfer of the following intervenors, D.H. Overmyer Company of Canada, Limited, D.H. Overmyer Company (Quebec) Ltd., Overmyer Canada Ltd., Overmodal Terminals, Inc., Standard Warehouse Co., Inc., Servicenter, Inc., Southwest Warehouse Co., Inc., Wilkinson Storage Corporation, Merchants and Manufacturers Warehouse, Inc., R–T Realty Corp., Freight Delivery Service, Inc. and Overmyer A.G., from D.H.O. and to Mr. Overmyer, personally. This transaction was fraudulently backdated to appear to have occurred in February, 1972, instead of the actual transfer date sometime after August 13, 1973. Thereafter, Mr. Overmyer in another backdated transfer without consideration placed these corporations as well as Intermodal Terminals, Inc. into the Bermuda Trust. While the corporations were then "owned" by the Bermuda Trust, Mr. Overmyer continued to use the assets of these entities as his own. For example, a major asset of Intermodal Terminals, Inc., was his personal residence which was also placed into this corporation at the time it was transferred to the trust.

The remaining intervenors were also fraudulently manipulated by Daniel H. Overmyer to hinder or delay the collection efforts of F.N.B.B. or to drain the assets of Telecasting. In transactions dated May, 1973, but which actually occurred after September 25, 1973, Mr. Overmyer and his wife transferred the ownership of Weathervane Farms, Inc. and Deauville Private Rental Homes, Inc. to the Barbara M. Overmyer Trust and the Harrison M. Overmyer Trust. Thereafter, on August 15, 1978, Mr. Overmyer caused Weathervane Farms to purchase a large parcel of real property in Westchester County, New York for $800,000. The trial court found that the money for the $270,513.53 down payment for this purchase was funds taken from Telecasting and passed through Ha-

dar and then passed without consideration through several of the intervening corporations. The parties which directly participated in this scheme were Jeebs Distribution Services, Expediter Warehouse Co., Peerless Manufacturing Corporation, National Distribution Services, Inc. and A.G.G. Projects Inc.

In furtherance of this scheme to defraud, Mr. Overmyer developed a combination of the classic deceptions known as a shell game and a pyramid scheme. First, the various corporate entities were used as shells to hide the assets fraudulently removed from Telecasting and various other Overmyer entities. Then the assets would be transferred without valid consideration and by using backdated documents or leases from corporate entity to entity leaving F.N.B.B. and the bankruptcy courts trying to ascertain the whereabouts of the property. In addition, to complicate the scheme, Mr. Overmyer created layer after layer of corporate entities in an attempt to conceal the fraud. At the bottom layer of this pyramid of corporate entities, the corporations accumulated massive debts and liabilities while constantly transferring any assets accumulated to the debt-free corporations at the top of the pyramid. An example of this layering can be seen by tracing the ownership of one of the intervening corporations. A.G.G. Projects, Inc. is a corporation that provided "management services" for various Overmyer companies and was owned by Jeebs Distribution, which was owned by Weathervane Farms, Inc., which was owned by the Barbara Overmyer Strang Trust and the Harrison Overmyer Trust.

The record is clear that the Overmyer Intervenors were totally controlled by Daniel H. Overmyer, and that there was such a unity of interest between Mr. Overmyer and these intervening parties that the findings of the bankruptcy court must be binding upon all of the parties to the fraud. Although the law will ordinarily treat corporations such as the Overmyer Intervenors as entities distinct from their owners, whenever it is necessary to relieve a fraud the individual corporate entities shall be disregarded. *Lakota Girl Scout Council, Inc. v. Havey Fund-Rais. Man., Inc.,* 519 F.2d 634 (8th Cir.1975); *International Controls Corp. v. Vesco,* 490 F.2d 1334 (2d Cir.1974), *cert. denied,* 417 U.S. 932, 94 S.Ct. 2644, 41 L.Ed.2d 236 (1974); *In re Gibraltor Amusements, Ltd.,* 291 F.2d 22, 24 (2d Cir.1961). The Overmyer Intervenors are merely the alter ego of Mr. Overmyer and were used as a front or mere conduit by him to carry out his fraudulent scheme. Thus, the assets and property obtained as a result of the fraud against the appellants can be impressed with a constructive trust to affectuate a remedy in a court of equity.

■ The intervenors contention that procedural due process requires that they receive a summons and be afforded the opportunity to actively participate in the trial proceedings is not well taken. As to the issues in these proceedings, the due process rights of the intervenors have been satisfied because a party whose interests are identical to theirs represented the intervenors in the trial court proceedings. In this action, Daniel H. Overmyer received adequate notice and an opportunity to be heard as required by the Constitution prior to a judgment being entered against him. *Fuentes v. Shevin,* 407 U.S. 67, 92 S.Ct. 1983, 32 L.Ed.2d 556 (1972). Since Mr. Overmyer received the required due process procedures, the intervenors, who do not dispute being his alter ego, have also been afforded the required constitutional protections in regard to those assets which were fraudulently obtained and are currently held as a constructive trust. *Southwest Airlines Co. v. Texas Intern Airlines, supra,* at 95–96. The concept of binding nonparties has been stated as follows:

> A person represented by a party to an action is bound by the judgment even though the person himself does not have notice of the action, is not served with process, or is not subject to service of process.

Restatement (Second) of Judgments § 41(2) (1980).

An equity court such as the bankruptcy court has broad powers to fashion a remedy to redress a fraud committed upon the debtor and the court itself. Fed. R.Civ.P. 71, made applicable to the bankruptcy court by then effective Bankr.R. 771 provides as follows:

When an order is made in favor of a person who is not a party to the action, he may enforce obedience to the order by the same process as if he were a party; and when obedience to an order may be lawfully enforced against a person who is not a party, he is liable to the same process for enforcing obedience to the order as if he were a party.

Therefore a judgment from a bankruptcy court can be enforced and directed against parties who originally were not parties to the action.

In this action the Overmyer Intervenors are constructively holding property that the trial court found belongs to the appellees. For example, the bankruptcy court found that the real property purchased with the funds of Telecasting, but held in the name of Weathervane Farms, Inc. belonged to Telecasting. Accordingly, Weathervane Farms, Inc. was merely holding the property in a constructive trust for Telecasting, and the bankruptcy court properly ordered that the title be vested in Telecasting. Hence, the judgment is proper as applied against the property constructively held by the Overmyer Intervenors.

### IX  STATUTE OF LIMITATIONS

The appellants have asserted that the claims brought by F.N.B.B. were barred by the six year statute of limitations under Massachusetts law. The appellants have correctly set forth that in Massachusetts an action to set aside a fraudulent conveyance must be commenced within six years after the cause of action occurs. *Moseley v. Briggs Realty Co.*, 320 Mass. 278, 69 N.E.2d 7 (1946); *Norwood Trust Co. v. Twenty-Four Federal Street Corporation*, 295 Mass. 234, 3 N.E.2d 826 (1926).

Although this issue was not clearly raised in the trial court, it is apparent from the record that F.N.B.B.'s claim was brought within the six year limitation period. Recently the Massachusett's courts have found that any running of the statute of limitations is tolled when there has been a concealment of a fraud. The state court found that:

the statute of limitations may be tolled under G.L.C. 260, § 12, if the wrongdoer, either through actual fraud or in breach of a fiduciary duty of full disclosure, keeps from the person injured knowledge of the facts giving rise to a cause of action and the means of acquiring knowledge of such facts.

*Frank Cooke, Inc. v. Hurwitz*, 10 Mass. App. 99, 406 N.E.2d 678, 683 (1980). In this action, F.N.B.B. would not have obtained actual knowledge of the fraudulent activities of the appellants until March 25, 1981 when it obtained control of Telecasting. Thus, the statute of limitations would be tolled as a matter of law until this date, and all proceedings held by the trial court were well within the six year statutory period.

Accordingly, having reviewed the record and each of the issues raised by the appellants, the court hereby affirms the order of the bankruptcy court entered on September 24, 1982. In addition, the agreement between D.H.O. and F.N.B.B. and Telecasting filed on May 23, 1984 to dismiss any and all claims between those parties arising out of this appeal is hereby approved by this court. It is further ordered by the court that the appeal filed by I.S.L.I. is dismissed for want of prosecution.

IT IS SO ORDERED.