**In re Wallace TRIPPLETT, Debtor.**

**Bankruptcy No. 88 B 18468.**

United States Bankruptcy Court, N.D. Illinois, E.D.

July 12, 1990.

Eugene J. Rossi, Tax Div., U.S. Dept. of Justice, Washington, D.C., for the I.R.S.

Russell V. Sutton, Chicago, Ill., for debtor.

## MEMORANDUM OF DECISION

EUGENE R. WEDOFF, Bankruptcy Judge.

The matter now before the court in this Chapter 13 case is the debtor's objection to a claim of the Internal Revenue Service. Prior to filing his bankruptcy petition, the debtor, Wallace Tripplett, had been assessed by the IRS with a penalty for non-payment of withholding taxes; during the bankruptcy proceedings, the IRS filed a claim against the Tripplett estate, based on this penalty. Tripplett responded to the IRS claim by filing both an objection and a jury demand. The court denied the jury demand and conducted a bench trial on the claim objection. For the reasons set forth below, the court now (1) confirms its prior determination that the court, without a jury, was the proper factfinder, and (2) disallows the IRS's claim.

## FINDINGS OF FACT

Triplett's difficulties with the IRS arise out of services that he performed for a church on the south side of Chicago, the Mount Calvary Baptist Church (the "Church"), and for a grade school connected with the Church, the Mount Calvary Christian Academy (the "Academy"). The Church was established during the 1920's (Tr. at 9, IRS Ex. 33), and the Academy was founded, by the Church, in 1982–1983 (Tr. at 17).[1] The Academy was operated as a "ministry" of the Church, much like a division of a corporation: it maintained separate accounting and personnel but was not legally distinct. (See Tr. at 153–154, 176.)

Tripplett joined the Church in 1965 (Stip. ¶ 16) and became a Trustee and Deacon within two years (Tr. at 11–12, Stip. ¶ 3). In 1983, he was elected "financial secre-

---

1. Citations to the record are set forth as follows: "Stip." refers to the written stipulations of the parties, admitted into evidence at the beginning of the trial on January 23, 1990; "Tr." refers to the January 23, 1990 transcript; and "IRS Ex." refers to IRS exhibits, admitted into evidence by stipulation of the parties.

tary" of the Church (Tr. at 18, Stip. ¶ 3), and during his tenure as financial secretary, he assumed the office of Church treasurer, on a non-elected basis (*see* Tr. at 49–50, 72, IRS Ex. 27 (Church letterhead listing Tripplett as "secretary/treasurer"), IRS Ex. 17 (signature cards)). As the financial secretary and treasurer, Tripplett received a weekly salary of $100. (Stip. ¶ 14.)

Tripplett's titles give little indication of the nature of the work he actually did for the Church.[2] Tripplett's primary responsibility was preparing and signing Church checks. Two signatures were required on these checks, and Tripplett was one of three persons authorized to co-sign. (Stip. ¶¶ 4, 5 and 6.) The others were Franklin Dale, the Chairman of the Deacon Board, and Delores Pulliam, the Church Clerk. (Stip. ¶ 6.) During an average week, Tripplett signed ten checks, for a variety of Church obligations, including withholding taxes, payroll, gas, light and telephone bills. (Stip. ¶¶ 7, 8.)

Four witnesses credibly testified that Tripplett's checkwriting responsibilities did not include determining which parties would receive payment. (Tripplett, Tr. at 21; Larrie Lovett, deacon of the Church and later Chairman of the Deacon Board, Tr. at 82; Carl Miller, former treasurer, Tr. at 101; James Anderson, Superintendent of the Sunday School, Tr. at 104). Tripplett's role in the checkwriting process was limited to (1) receiving bills or a list of bills from Dale or Pulliam every Sunday (Tr. at 20, 83); (2) writing the checks for the selected bills (Tr. at 20); and (3) returning the signed checks to Pulliam or Dale (Tr. at 20). Tripplett never personally mailed the checks. (Tr. at 44–45.)[3]

In addition to signing checks according to Dale's instructions, Tripplett had responsibility for compiling financial statements which appeared in the Church Bulletin (Tr. at 82) and for preparing and signing IRS 941 forms for the Church (Stip. ¶ 9).[4] He also met twice with IRS agents to discuss the Church's delinquent withholding taxes. (Stip. ¶ 10.)

Tripplett did not influence the broader fiscal policies of the Church. The pastor, Donald Parson, ultimately determined Church financial policy. (Tr. at 15, 98 and 103.) In his absence, Franklin Dale made the financial decisions. (Tr. at 16, 147 (indicating that Dale was the "hands-on" manager of the Church).) By 1983, Parson and Dale operated the Church without regard for the formal organizational structure envisaged in the Church by-laws. For example, they assumed the functions of the Trustee Board by themselves administering Church property and directing Church fiscal policy while preventing the Trustee Board from meeting. (*See* Tr. at 39–41; *see also* IRS Ex. 20 at Article VIII § 4D (setting forth the Trustee Board's functions).)

Tripplett had an even more limited connection to the Academy. For two and a half months in 1984–85, Tripplett was its temporary business manager, acting in the interim period between two permanent business managers. (Tr. at 119.) Although there was evidence that the permanent business manager had authority to decide which bills were paid, Tripplett was not vested with this authority. (Tr. at 118.) Instead, Tripplett's responsibilities were largely confined to collecting tuition from students as they arrived in the morning (Tr. at 171–172). Although Tripplett had possession of the Academy's financial records and checkbook (Tr. 115 and 119), he did not have the authority to sign Academy checks (Tr. at 131). Dr. William Harris, the head administrator of the Academy,

---

**2.** Church by-laws do not describe the duties of a financial secretary. (IRS Ex. 20 at Art. IX § 5.) And although the bylaws do define the duties of the treasurer (*Id.*, Art. IX § 6), the bylaws were not generally adhered to, as noted in the text below.

**3.** On several occasions, Tripplett and the former treasurer, Miller, did attempt to arrange for payment of bills on their own initiative. They wrote checks for the bills they felt were most urgent and handed the checks to Pulliam. However, Dale kept these checks in his desk, refusing to mail them. (Tr. at 100–101.)

**4.** 941 forms are quarterly reports on the amount of wages being withheld. *See* Internal Revenue Service Regulations, 26 CFR §§ 31.3507-1(c)(1)(i), 31.6011(a)–1(a)(1) (1989).

credibly testified that Tripplett did not review Academy bills and that another official of the school, James Hinton, decided which bills should be paid. (Tr. at 172.) In addition, at Hinton's request, Tripplett contacted and met with Beverly Bank officials to ask for a loan to pay the Academy's delinquent taxes. (Tr. at 31, Stip. ¶ 11.)

Based on his involvement in the Church and Academy, the IRS assessed Tripplett pursuant to 26 U.S.C. § 6672 for failure to remit Church and Academy withholding taxes in the specific amounts and tax quarters as follows: $12,987.43 (December 31, 1983); $14,913.96 (March 31, 1984); $12,987.44 (June 30, 1984); $15,369.23 (December 31, 1984); and $4,019.88 (March 31, 1985). (IRS Ex. 14.) Tripplett filed his Chapter 13 petition on November 30, 1988. The IRS filed a proof of claim in the amount of $70,208.41 plus statutory additions on April 14, 1989, to which Tripplett objected, subsequently demanding a jury trial.

## CONCLUSIONS OF LAW

### A. Jurisdiction.

■ Tripplett's objection to the IRS claim is within the jurisdiction of the district court as a civil proceeding arising in a case under title 11 U.S.C. (the "Bankruptcy Code" or the "Code"). 28 U.S.C. § 1334(b); *see In re Wood*, 825 F.2d 90, 97 (5th Cir. 1987) (defining "arising in" proceedings). Proceedings concerning the allowance of claims against the estate are core matters which, upon reference from the district court, bankruptcy judges may determine on a final basis. 28 U.S.C. § 157(b)(2)(B); *In re Fogelberg*, 79 B.R. 368, 372 (Bankr.N.D. Ill.1986). General Local Rule 2.33(A) of the Northern District of Illinois refers such matters to the bankruptcy judges of this district.

### B. The Right to Jury Trial.

■ In order for a party to have the right to a jury trial for a particular dispute, that right must be accorded either by statute or the Seventh Amendment of the Constitution. *See Granfinanciera v. Nordberg (In re Chase and Sanborn Corp.),*—— U.S. ——, 109 S.Ct. 2782, 2789, 2789 n. 3, 106 L.Ed.2d 26 (1989); *In re Smith*, 84

B.R. 175, 177 (Bankr.N.D.Ariz.1988) (collecting authority). Neither source provides a right to jury trial for Tripplett's claim objection.

■ 1. Statutory right. As originally enacted, the bankruptcy reform legislation of 1978 contained an explicit provision, codified as 28 U.S.C. § 1480, dealing with the right to jury trial:

(a) Except as provided in subsection (b) of this section, this chapter and title 11 do not affect any right to trial by jury, in a case under title 11 or in a proceeding arising under title 11 or arising in or related to a case under title 11, that is provided by any statute in effect on September 30, 1979.

(b) The bankruptcy court may order the issues arising under section 303 of title 11 [governing involuntary bankruptcy petitions] to be tried without a jury.

28 U.S.C. § 1480 (1982 Ed.1984 Supp. II). In 1984, as part of the Bankruptcy Amendments and Federal Judgeship Act of 1984 ("BAFJA"), Pub.L. No. 98–353, *reprinted in* 1984 U.S.Code Cong. & Admin.News (98 Stat.) 333 *et seq.*, a new provision was enacted on the matter of jury trials in bankruptcy, codified as 28 U.S.C. § 1411. Section 1411 states the following:

(a) Except as provided by section (b) of this section, this chapter and title 11 do not affect any right to trial by jury that an individual has under applicable non-bankruptcy law with regard to a personal injury or wrongful death tort claim.

(b) The district court may order the issues arising under section 303 [governing involuntary bankruptcy petitions] of title 11 to be tried without a jury.

28 U.S.C.A. § 1411 (West Supp.1990). The impact of these statutory provisions is far from clear. The initial problem is that the BAFJA legislation contradicts itself on the question of whether Section 1480 has been repealed. Section 113 of BAFJA amends Section 402(b) of the Bankruptcy Code to state that Title II and its amendments to Title 28 of the United States Code, which includes Section 1480, "shall not become effective." BAFJA, Pub.L. No. 98–353 *reprinted in* 1984 U.S.Code Cong. & Admin.

News (98 Stat.) 343. On the other hand, Section 121(a) of BAFJA states that Title II of the Code and its amendments shall become effective on the date of the enactment of BAFJA.[5] *Id.* at (98 Stat.) 345. There is no satisfactory way to interpret these contradictory provisions. *In re O'Bannon,* 49 B.R. 763, 767 (Bankr.M. D.La.1985).

Next, the legislative history of Section 1411 provides no guidance as to its intended scope. *See Granfinanciera,* 109 S.Ct. at 2789 n. 3 (stating that Section 1411's legislative history is "confused"); *see generally,* Gibson, *Jury Trials in Bankruptcy Obeying the Commands of Article III and the Seventh Amendment,* 72 Minn.L.Rev. 967, 991–96 (1988) (hereinafter "Gibson") (compiling the legislative history of Section 1411 and its predecessors). Section 1411 was drafted by a conference committee, whose report contains the text of the section without commentary. *See* H.R.Conf. Rep. No. 882, 98th Cong., 2d Sess. 1 (1984). Nor can congressional intent be gleaned from the differing proposals that the conference committee considered. The Senate proposal on jury trials in bankruptcy was very broad. Apart from granting the district court the power to prohibit jury trials of involuntary bankruptcy petitions, the Senate would have provided that title 28 and the Bankruptcy Code "do not affect any right to trial by jury." S.1013, 98th Cong., 1st Sess. at § 1477(a) (Apr. 7, 1983). On the other hand, the House-passed bill omitted any jury trial provision, without explanation. Finally, there is no helpful floor debate on the jury trial issue.[6]

From this background, a split in authorities has developed. *See In re Smith,* 84 B.R. at 177–178 (collecting authority). One group of decisions takes the position that Section 1480 was repealed and that Section 1411 limits jury trials to personal injury and wrongful death actions. *See, e.g., In re Fort Lauderdale Hotel Partners, Ltd,* 103 B.R. 335, 336–337 (Bankr.S.D.Fla.1989); *In re Smith,* 84 B.R. 175, 177–178 (Bankr. D.Ariz.1988); *In re O'Bannon,* 49 B.R. 763, 769 (Bankr.M.D.La.1985); *see generally* Gibson, *supra,* at 996 (adopting this position). The Advisory Committee Notes accompanying the abrogation of Bankruptcy Rule 9015, which governed jury trial procedure in bankruptcy courts, supports this reading of the law. The Advisory Committee Note states that:

> Former section 1480 of title 28 preserved a right to trial by jury in any case or proceeding under title 11 in which jury trial was provided by statute.... Section 1480 was repealed. Section 1411, added by the 1984 amendments, affords

---

5. It appears that Congress simply made a mistake in enacting both Sections 113 and 121(a) of BAFJA. *See In re O'Bannon,* 49 B.R. 763, 767 (Bankr.M.D.La.1985). In the post-BAFJA interviews discussed in n. 6 below, Senator Dole stated "We goofed" when asked about Sections 113 and 121(a). Interview *reprinted in* 3 ABI Newsletter No. 3 Winter 1984/1985.

6. After the passage of the Bankruptcy Amendments and Federal Judgeship Act of 1984 ("BAFJA"), which enacted Section 1411, several Senators granted interviews to clarify some of its provisions. *In re O'Bannon,* 49 B.R. 763, 767 n. 11 (Bankr.M.D La.1985). When asked about Section 1411, Senator DeConcini made the following comments:

> Strange as it may seem, in light of the changes in language from the text of the old law to the language of the new Section 1411(a), I believe there was no intent on the part of Congress to alter or to modify the rights to jury trial that might have existed under the Reform Act. The change in statutory language came about as a result of compromises that the conferees settle[d] upon in resolving the issue of absten-

tion in personal injury and wrongful death cases ... the conferees simply inadvertently failed to pick up the broader language of the former provision. There was no desire on the part of any of the conferees to limit the right of jury trials in other areas.

Interview *reprinted in* 3 ABI Newsletter No. 3 Winter 1984/1985. However, these remarks cannot be accepted as an authoritative indication of congressional intent. First, such post-enactment statements are not binding on courts. *In re Wolfe,* 68 B.R. 80, 88 (Bankr.N.D.Tex. 1986), *aff'd,* 67 B.R. 260 (N.D.Tex.1986). Second, there is no indication that other legislators adopted Senator Deconcini's views. *See* Senator Dole's comments, 3 ABI Newsletter No. 3 Winter 1984/1985 (indicating that the passage of Section 121(a) of BAFJA, preserving Section 1480, was a mistake); *O'Bannon,* 49 B.R. at 768 n. 14; Gibson, *supra,* at 996. Third, and most important, the technical corrections bill, S. 529, introduced by Senators DeConcini and Dole, did not rectify the "mistake" by inserting language preserving the former jury trial provision, Section 1480. *O'Bannon,* 49 B.R. at 768 n. 14; Gibson, *supra,* at 996.

a jury trial *only* for personal injury or wrongful death claims....

Advisory Committee Note (1987), *reprinted in* Norton Bankr Rules Pamphlet 1989–1990 Ed, 817–818 (emphasis added). In addition, the Supreme Court has also stated that Section 1480 "was apparently repealed by the 1984 amendments." *Granfinanciera*, 109 S.Ct. at 2790 n. 3.

This view, however, renders Section 1411 internally inconsistent. If, under Section 1411(a), there is *only* a right to jury trial in bankruptcy proceedings for personal injury and wrongful death actions, there would be no need for Section 1411(b), which authorizes the district court to order involuntary petitions (under Section 303 of the Bankruptcy Code) to be tried without a jury. In *Granfinanciera*, the Supreme Court also recognized that "although [Section 1411] might suggest jury trials are available only in personal and wrongful death actions, that conclusion is debatable," since Section 1411(b) suggests that "the [district] court lacks ... discretion to deny jury trials on at least some issues presented in connection with voluntary petitions." 109 S.Ct. at 2789 n. 3; *see also* Gibson, *supra*, at 991. However, if Section 1411(b) was intended to provide a right to jury trial in certain voluntary proceedings, it entirely fails to indicate the scope of this right.

The other line of cases avoids these difficulties by concluding that Section 1480(a)

has not been repealed. *See, e.g., In re Wolfe*, 68 B.R. 80, 87 (Bankr.N.D.Tex. 1986), *aff'd*, 67 B.R. 260 (N.D.Tex.1986); *In re Price–Watson*, 66 B.R. 144, 154–155 (Bankr.S.D.Tex.1986); *In re Rodgers & Sons, Inc.*, 48 B.R. 683, 687 (Bankr.E.D. Okl.1985).[7] Under these decisions, Section 1411(a) supplements the jury right accorded by Section 1480(a), and the courts must analyze whether either Section 1411 or Section 1480(a) provides a right to jury trial.

If the first view is accepted, Tripplett plainly has no statutory right to jury trial, since the IRS claim objection does not involve a personal injury or wrongful death. But even under the more expansive interpretation of the statutes, the result is the same. If Section 1480(a) remains in force, it recognizes a right to jury trial only insofar as that right was accorded by a "statute in effect on September 30, 1979." The Bankruptcy Code took effect on October 1, 1979 (Pub.L. No. 95–598, § 402 *reprinted in* 11 U.S.C.A. at 1 (West Supp.1990)), and thus the apparent intent of Section 1480(a) is to preserve the right to jury trial that existed under the 1898 Bankruptcy Act. Section 1480 has been so interpreted. *E.g., In re McLouth Steel Corp.*, 55 B.R. 357, 361 (E.D.Mich.1985) (collecting authority); *In re D.H. Overmyer Telecasting Co.*, 53 B.R. 963, 979–80 (N.D.Ohio 1984); *In re Country Junction, Inc.*, 41 B.R. 425, 430 (W.D.Tex.1984), *aff'd*, 798 F.2d 1410 (5th Cir.1986).[8]

---

**7.** None of these decisions, however, urges that Section 1480(b) remains effective. Section 1480(b) authorized the *bankruptcy courts* to limit the use of juries in involuntary proceedings. Section 1411(b) provides that the *district court* may impose such limitations, in keeping with the overall thrust of BAFJA providing for jurisdiction in the district court, with the bankruptcy judges exercising jurisdiction only on referral. *See* 28 U.S.C. § 157. Because Section 1480(b) cannot be reconciled with this jurisdictional scheme, it must be seen as supplanted by Section 1411(b). *See St. Martin Evangelical Lutheran Church v. South Dakota*, 451 U.S. 772, 788, 101 S.Ct. 2142, 2151, 68 L.Ed.2d 612 (1981) (setting forth standards for finding repeal by implication); *see generally*, Singer, *Sutherland Statutory Construction* § 23.09 (4th ed. 1990).

**8.** There was a conflicting interpretation of Section 1480(a), under which a jury trial right was accorded if the underlying issues would have been tried to a jury outside of bankruptcy. *See, e.g., In re Wolfe*, 68 B.R. 80, 89 (Bankr.N.D.Tex.

1986), *aff'd*, 67 B.R. 260 (N.D.Tex.1986); *In re Lombard–Wall, Inc.*, 48 B.R. 986, 993 (S.D.N.Y. 1985); *In re Professional Air Traffic Controllers Organization*, 23 B.R. 271, 274–275 (D.D.C.1982). Under this interpretation of Section 1480, Tripplett would be entitled to a jury trial pursuant to *U.S. v. McMahan*, 569 F.2d 889, 892 (5th Cir. 1978) (*en banc*). However, this approach ignores the plain language of Section 1480 which specifically contemplates that statutes "in effect on September 30, 1979" govern the right to a jury trial. Moreover, this interpretation suggests that Section 1480 significantly expanded jury trials in bankruptcy because many claims are based on actions at law which, outside of bankruptcy, would require a jury. The legislative history of Section 1480 does not reveal a Congressional intent to implement such a dramatic change. *In re McLouth Steel Corp.*, 55 B.R. 357, 361 (E.D.Mich.1985); *see also Gibson* at 984.

To determine the right to jury trial under the 1889 Act, the threshold inquiry was whether the matter to be tried was a "summary" or "plenary" proceeding. *See McLouth*, 55 B.R. at 361; *see generally* Gibson, *supra*, at 971. If the proceedings were "summary," they were generally brought in the bankruptcy courts. *See Katchen v. Landy*, 382 U.S. 323, 327, 86 S.Ct. 467, 471, 15 L.Ed.2d 391 (1965); *In re Land Investors*, 544 F.2d 925, 929–930 (7th Cir.1976) (discussing summary versus plenary jurisdiction); *see generally* Gibson, *supra*, at 971–2. A bankruptcy judge conducted summary proceedings without a jury except when (1) the proceeding involved questions of insolvency or the commitment of bankruptcy acts in involuntary cases or (2) the proceeding was a dischargeability case. Bankruptcy Act of 1898, (the "Act"), 11 U.S.C. § 42(a) (1976) (repealed in 1979 by the Bankruptcy Code, 11 U.S.C. *et seq.*) (Section 19(a) of the Act pertaining to jury trials in involuntary cases); Act, 11 U.S.C. § 35(c)(5) (1976) (repealed) (Section 17(c)(5) of the Act pertaining to jury trials in dischargeability cases). If the summary proceeding involved questions of insolvency or the commitment of bankruptcy acts in involuntary cases, then the bankruptcy judge conducted the jury trial unless the parties specified in their jury demand that the district court should conduct the jury trial or the local rules provided that the district court should conduct the jury trial. Former Bankruptcy Rule 115(b)(1); 2 *Collier on Bankruptcy*, ¶ 19.03 (14th ed. 1984 Supp.). If the summary proceeding was a dischargeability case, the district judge conducted the jury trial unless the bankruptcy judge determined that the issue is not triable by jury or the local rules provided that the bankruptcy judge should conduct the jury trial. Former Bankruptcy Rule 409(c) and Advisory Committee Notes to Former Rule 409(c); 1A *Collier on Bankruptcy*, ¶ 17.28A[6] (14th ed. 1984 Supp.).[9] In contrast to most summary proceedings, the district court or state court would conduct plenary proceedings and would apply non-bankruptcy law to determine the right to jury trial. *See Katchen*, 382 U.S. at 327–328, 86 S.Ct. at 471–472; *see generally* Gibson, *supra*, at 972.

Objections to claims were summary proceedings. In *Katchen*, the Supreme Court stated that it is "clear that the expressly granted power to 'allow,' 'disallow' and 'reconsider' claims ... is to be exercised in summary proceedings and not by the slower and more expensive process of a plenary suit." 382 U.S. at 329, 86 S.Ct. at 472. Because the allowance of a claim does not involve an involuntary bankruptcy or a dischargeability proceeding, the bankruptcy judge would conduct the proceeding without a jury. Therefore, Tripplett has no right to a jury trial of his claim objection under Section 1480, even if that section is still effective.

■ 2. Constitutional right. Since Tripplett has no statutory right to a jury trial of his claim objection, the only possible source for that right would be the Seventh Amendment. The amendment provides: "In Suits at common law, where the value in controversy shall exceed twenty dollars, the right of trial by jury shall be preserved, and no fact tried by a jury, shall be otherwise reexamined in any Court of the United States, than according to the rules of the common law." In *Granfinanciera*, the Supreme Court recently examined the Seventh Amendment in the context of a bankruptcy proceeding and held that a defendant in a fraudulent conveyance action, who did not file a claim against the estate, had the right to a jury trial under the Seventh Amendment. The Court articulated a three step analysis to determine whether the Seventh Amendment requires a jury trial:

First, we compare the statutory action to 18th–century actions brought in the courts of England prior to the merger of the courts of law and equity. Second, we examine the remedy sought and determine whether it is legal or equitable in nature.... The second stage of this

---

**9.** The right to jury trial in dischargeability case was generally limited to cases where issues of liability and damages remained after the debt was found non-dischargeable. Gibson, *supra*, at 973.

analysis is more important than the first.... If, on balance, these two factors indicate that a party is entitled to a jury trial under the Seventh Amendment, we must decide whether Congress may assign and has assigned resolution of the relevant claim to a non-Article III adjudicative body that does not use a jury as factfinder.

*Granfinanciera,* 109 S.Ct. at 2790 (citations omitted). The *Granfinanciera* analysis was reexamined and again applied in *Chauffeurs, Teamsters and Helpers, Local No. 391 v. Terry, et al.,* ─ U.S. ─, 110 S.Ct. 1339, 1345, 108 L.Ed.2d 519 (1990). As applied to the present proceeding, the first two steps of the analysis indicate that there is no right to jury trial, and therefore, the question of whether Congress could assign the matter to a non-jury tribunal does not arise.

The first step in the *Granfinanciera* analysis is to find an 18th-century English proceeding analogous to the allowance of a claim in bankruptcy, and then to ascertain whether the proceeding would be heard at law or in equity.[10] The 18th-century analog to the claim objection at issue in the present case appears to be an action or suit to determine whether a creditor had a legitimate claim against a bankrupt's estate.

In 18th-century England, the chancery courts generally administered the bankruptcy laws. Chancery apparently resolved disputes concerning claims in several ways. *See generally,* Baird, *The Seventh Amendment and Jury Trials in Bankruptcy,* The Supreme Court Review, 261, 266 (1989). First, the chancery courts themselves could determine the legitimacy of the claim. *See Clarke v. Capron,* 2 Ves.Jun. 667, 30 Eng.Rep. 832, 833 (1795) ("In the course of bankruptcy nothing is more usual than to direct a bill to ascertain, whether a debt is due."). Second, bank-

ruptcy "commissions," which were extrajudicial bodies approved by the chancery courts to administer bankruptcies, could determine the amount of the creditor's claim. *See* Blackstone, *Commentaries on the Laws of England,* A facsimile of the First Edition of 1765–1769, Vol. II "Of the Rights of Things" (1766), ch. 31 at 480 (discussing the formation of commissions) and 487 (stating that "the commissioners shall direct a dividend to be made, at so much in the pound, to all creditors who have before proved, or shall then prove, their debts"). Finally, the Chancellor could refer at least some disputes to the common law courts through a "feigned issue." *See, e.g., Ex parte Cottrell,* 2 Cowp. 742 (King's Bench 1790). After the trial, the case would revert back to the chancery courts. *Cf. In re Gulston,* 1 Atkyns 193, 26 Eng. 125, 127 (1743) (after the common law courts decided if the debtor committed acts of bankruptcy, the parties were "at liberty to apply to the [Lord Chancellor] for further directions").

As an alternative to suing in the chancery courts, the 18th-century English bankruptcy statute provided that such claims could be submitted to an arbitrator with the consent of the creditors. 5 Geo. 2 § XXXIV (1732). The purpose of allowing arbitration was apparently to avoid suits "which are oftentimes many Years depending." *Id.*

Therefore, in 18th-century England, claims resolution was performed under the aegis of the chancery courts or by an arbitrator. The chancery courts may sometimes have delegated a specific claim dispute to the Common Law courts, to be heard by a jury. However, there is no indication that the moving party had a right to a jury. Instead, the Lord Chancellor would decide the best method for re-

---

**10.** In his concurrence in *Terry,* Justice Brennan urged the Court to drop the historical step in the *Granfinanciera* analysis to "save our courts from needless and intractable excursions into increasingly unfamiliar territory...." 110 S.Ct. at 1353. Justice Brennan argues that the historical test is difficult for judges to apply because judges do not have the "time [or] training necessary for reputable historical scholarship" and that such an analysis, even under the best of

circumstances, might not lead to "sound resolution" because the line between law and equity jurisdiction was not "fixed or static" in the 18th century. 110 S.Ct. at 1350, 1351, *quoting* James, *Right to a Jury Trial in Civil Actions,* 72 Yale L.J. 655, 658–659 (1963); *see also* Baird, *The Seventh Amendment and Jury Trials in Bankruptcy, supra,* at 266 (questioning the historical assumptions of the Supreme Court's analysis of the right to jury trials in bankruptcy).

solving the disputes or the parties would agree to arbitration.

The second, and more important, step under *Granfinanciera* is to ascertain the nature of the relief being sought. Awards of monetary damages are generally legal in nature. *Terry*, 110 S.Ct. at 1347; *Granfinanciera*, 109 S.Ct. at 2791, 2793. However, the allowance of a claim is not an award of damages; it is only a determination that a claim is entitled to a pro rata share in the debtor's estate. Thus, in its discussion of *Katchen v. Landy*, 382 U.S. 323, 86 S.Ct. 467, 15 L.Ed.2d 391 (1965), the Supreme Court in *Granfinanciera* indicated that whenever an issue "arises as part of the process of allowance and disallowance of claims, it is triable in equity." 109 S.Ct. at 2799; *see also Barton v. Barbour*, 104 U.S. 126, 134, 26 L.Ed. 672 (1881) (holding that there are no jury trials in claim resolution proceedings even if there would be a jury trial outside of bankruptcy). As the IRS correctly points out, the matter for which Tripplett seeks a jury trial in this case is not only a *part* of the process of allowance and disallowance of claims; the very purpose of Tripplett's objection is to disallow the IRS's claim. Both history and the nature of the remedy thus indicate that there is no right to jury trial, under the Seventh Amendment, in bankruptcy claim adjudication.

Since neither the applicable statutes nor the Constitution accord Tripplett a right to jury trial on his claim objection, the jury demand was disallowed, and the claim objection was heard by the court without a jury.

C. Liability under 26 U.S.C. § 6672.

■ The Tax Code (title 26, U.S.C.) requires employers to deduct and withhold social security and income taxes from their employee's wages. 26 U.S.C.A. §§ 3102 and 3402 (West Supp.1990). The employer is required to hold these deducted wages in trust for the government and may not use them to pay business expenses. 26 U.S. C.A. § 7501 (West Supp.1990); *Graunke v. U.S.*, 711 F.Supp. 388, 391 (N.D.Ill.1989). However, because these trust fund taxes accrue on the withholding date but generally are paid on a quarterly basis, they can

be a tempting source of available cash to a business. *Purdy Company of Illinois v. U.S.*, 814 F.2d 1183, 1186 (7th Cir.1987), *citing Slodov v. U.S.*, 436 U.S. 238, 243, 98 S.Ct. 1778, 1783, 56 L.Ed.2d 251 (1978). And even if the employer fails to remit the withheld taxes to the United States, the employee is credited with having paid the taxes. *Purdy*, 814 F.2d at 1186. Thus, to prevent loss of revenue, the Tax Code provides the IRS with several remedies in the event that withheld wages are not paid. *Id.* at 1186 (enumerating the IRS's remedies to collect delinquent withholding taxes under the Tax Code). Section 6672 is one of these remedies.

Section 6672 provides that "any person required to collect, truthfully account for, and pay over any tax ... who willfully fails to collect such tax, or truthfully account for an pay over such tax ... shall ... be liable to a penalty equal to the total amount of the tax evaded, or not collected, or not accounted for and paid over." A "person" for purposes of Section 6672 encompasses employees who are under a duty to collect and pay over taxes to the United States. 26 U.S.C.A. § 6671(b) (West Supp. 1990).

The Seventh Circuit has held that Section 6672 contains two requirements. First, the taxpayer must be a "responsible person." Second, this responsible person must "willfully" fail to pay over the taxes to the government. *Sawyer v. U.S.*, 831 F.2d 755, 758 (7th Cir.1987); *Ruth v. U.S.*, 823 F.2d 1091, 1093 (7th Cir.1987); *Monday v. U.S.*, 421 F.2d 1210, 1211 (7th Cir.1970), *cert. denied*, 400 U.S. 821, 91 S.Ct. 38, 27 L.Ed.2d 48 (1970). The "responsible person" requirement controls this case.

In the Seventh Circuit, the touchstone for being a "responsible person" under Section 6672 "is 'control of finances within the employer corporation: the power to control the decision-making process by which the employer corporation allocates funds to other creditors in preference to its withholding tax obligations' ... 'It is sufficient that the person involved have significant control over the disbursal [sic] of corporate funds ...'" *Purdy*, 814 F.2d at 1188 (cita-

tions omitted), *quoting Haffa v. U.S.*, 516 F.2d 931, 936 (7th Cir.1975) and *Adams v. U.S.*, 504 F.2d 73, 75 (7th Cir.1974).

The district court in *Graunke v. U.S.*, 711 F.Supp. 388 (N.D.Ill.1989), recently applied the responsible person standard to facts remarkably similar to the case at bar. The taxpayer in that case, Mark Graunke, received $30,000 as a full-time employee of several companies owned by Ronald Curcio. Graunke's official position was unclear because Curcio operated his companies without regard to corporate formalities. Graunke was represented in various corporate documents as an "agent," "comptroller," "treasurer," and even "president."

Irrespective of his official titles, Graunke was responsible for accounting and paying bills at Curcio's direction. As part of his general duties, Graunke spent one-half to two days a week tending to accounting matters relating to one of Curcio's companies, the Heritage Cabinet Company ("Heritage"). Graunke signed Heritage checks and completed and signed Heritage's 941 forms. However, Graunke did not make financial decisions for his employer. When Heritage could not pay all of its creditors (which occurred regularly), Curcio would decide which bills should be paid and then direct Graunke to write the appropriate checks. "There [was] no evidence that Graunke could or would have ... overridden Curcio's payment decisions." 711 F.Supp. at 394. Moreover, Graunke was not responsible for the day-to-day operations of Heritage.

The IRS assessed Graunke pursuant to Section 6672 for failure to remit Heritage's withholding taxes. The IRS, relying on *Howard v. U.S.*, 711 F.2d 729 (5th Cir. 1983), *Roth v. U.S.*, 779 F.2d 1567 (11th Cir.1986) and *Gephart v. U.S.*, 818 F.2d 469 (6th Cir.1987), argued that Graunke could only avoid being a "responsible person"

under Section 6672 for Heritage's withholding taxes by writing checks for the taxes contrary to Curcio's instructions or by refusing to sign checks for any other purpose until the taxes were paid. The district court rejected this argument. Relying on *Jay v. United States*, 865 F.2d 1175 (10th Cir.1989), the court concluded that

> it does not appear that the law has gone so far as to require that a person must disregard checkwriting instructions to avoid liability [under Section 6672]. Rather the focal point in all of the cases is whether the plaintiff 'possessed a sufficient degree of authority over corporate decisionmaking to make him a responsible person.'

711 F.Supp. at 394.

Applying this test, the district court held that Graunke was not a responsible person because (a) Curcio, the sole shareholder, "strictly controlled" the payment of creditors, (b) there was no evidence that Graunke could or would have overridden Curcio's orders, and (c) Graunke did not control the day-to-day operations of Heritage. *Id.* at 394. The authority to sign checks and complete 941 forms was insufficient control to find that Graunke was a "responsible person" under Section 6672.

 Like the taxpayer in *Graunke*, Tripplett has proven that he was not a responsible person under Section 6672.[11] As regards the Church finances, Franklin Dale, not Tripplett, made both the preliminary and final decision as to which bills were to be paid and sent out. Tripplett signed checks according to Dale's specific instructions and filled out the Church's 941 forms. When Triplett attempted to override Dale's authority, Dale prevented Tripplett from acting by refusing to mail out the checks Tripplett felt were most important. Moreover, Tripplett was not respon-

11. Tripplett bears the burden of proof. In bankruptcy, the filing of a proof of claim is *prima facie* evidence of the amount and validity of the claim. The debtor must come forward and rebut this *prima facie* showing. Bankruptcy Rule 3001(f). The Bankruptcy Rules do not address the burden of proof once the *prima facie* case is rebutted, but it appears that applicable nonbankruptcy law governs who bears the

ultimate burden of proof. It is well established that the taxpayer bears the burden of persuasion by the preponderance of the evidence as to all issues presented in a Section 6672 assessment case. *Ruth v. U.S.*, 823 F.2d 1091, 1093 (7th Cir.1987). Consequently, Tripplett, the taxpayer, bears the burden of proof by the preponderance of evidence.

sible for day-to-day Church operations, which were managed by Dale or by the pastor, Donald Parson.[12] Tripplett thus did not exert sufficient control to be a responsible person under Section 6672.

■ Even more clearly, Tripplett was not a responsible person as the Academy's "temporary business manager." Tripplett exerted no control over the decisionmaking process at the Academy. In fact, he was not even authorized to sign Academy checks. Instead, he collected tuition for the Academy and represented the Academy at the Beverly Bank upon a school official's request. The fact that the Academy was a ministry of the Church is of no import because Tripplett was not a responsible person under Section 6672 in either organization. Thus, Tripplett is not liable for the Academy's withholding taxes.[13]

## CONCLUSION

For the reasons stated above, Tripplett's objection to the IRS's claim is sustained and the IRS's claim is disallowed. An appropriate order will be entered.

**12.** The *Graunke* court emphasized that the taxpayer's employer had admitted to liability under Section 6672. In this case, there is no evidence that a party other than Tripplett has admitted to liability under Section 6672. However, ample evidence exists to indicate that other Church employees, like Dale or Parson, may be liable. It is fortuitous that Tripplett's assessment has been litigated before assessments against these other persons. Moreover, whether the IRS chooses to pursue other parties is irrelevant to the "control" test applied in *Graunke.*

**13.** In its closing argument, the IRS relied heavily on *Gephart v. U.S.,* 818 F.2d 469 (6th Cir. 1987). In *Gephart,* the IRS assessed a company's general manager, Gephart, under Section 6672. Gephart administered the company's daily operations and decided which bills were to be paid in the corporate president's absence. The Sixth Circuit found that the manager was a "responsible person" and rejected the manager's defense that he was ordered to sign certain checks as a matter of fact. *See also Jay v. U.S.,* 865 F.2d 1175 (10th Cir.1989); *Graunke,* 711 F.Supp. at 394. *Gephart* is factually distinguishable from the case at bar. Tripplett did not control the day-to-day operations of the Church or decide which bills were paid.

In addition, the IRS furnished this court with a copy of *Hochstein v. U.S.,* 900 F.2d 543 (2nd Cir.1990) after trial. Like *Gephart, Hochstein* is factually distinguishable from this case. In *Hochstein,* the taxpayer was the controller of a corporation who was responsible for overseeing the corporate finances. The crucial difference in the *Hochstein* case is that the taxpayer "made the initial determination of the order in which large bills were paid, subject to President Eckstein's approval." 900 F.2d at 547. Tripplett did not make either the initial or final determination as to which bills were paid.